In the

# United States Court of Appeals
## For the Seventh Circuit
_____

Nos. 06-1519, 06-1757, 06-1777, 06-1801,
06-1963, 06-2268, 06-2333 & 06-2594

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

NICOLAS J. ACOSTA, ERNESTO ESTRADA III,
GREGORIO M. ACOSTA, JR., JORGE N. BARRAGAN, JR.,
PEDRO ZAMORA, FLORENTINO CASTILLO,
DONALD K. FAIRBANKS, and ROBERT G. SMITH,

*Defendants-Appellants.*

_____

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 05 CR 39—**Barbara B. Crabb,** *Chief Judge.*

_____

ARGUED APRIL 30, 2007—DECIDED JULY 15, 2008

_____

Before ROVNER, WOOD, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* The eight defendants in this case participated in what we have previously described as a "long-running" conspiracy involving the distribution of "vast amounts of crack cocaine" by the Latin Kings gang on the Lac Courte Oreilles Reservation in Northern Wis-

consin. *United States v. Acosta*, 474 F.3d 999, 1000 (7th Cir. 2007). Four of the defendants were convicted following a jury trial; the others pleaded guilty. In addition to various individual issues raised on appeal, all of the defendants (with the exception of Robert Smith, whose attorney filed an *Anders* brief) challenge the district court's sentencing findings regarding drug quantity. We affirm.

## I. Background

On March 22, 2005, a grand jury sitting in the Western District of Wisconsin returned an eight-count indictment against 11 defendants stemming from their involvement in the Latin Kings crack distribution network on the Lac Courte Oreilles ("LCO") Reservation in Sawyer County, Wisconsin. The case was assigned to Chief Judge Barbara Crabb, who also presided over the prosecution of other defendants involved in the LCO Latin Kings drug organization. *See Acosta*, 474 F.3d at 999-1000.

Count 1—the centerpiece of the indictment—accused John A. Radermacher, Pedro Zamora, Donald K. Fairbanks, Andre R. Lasieur, Robert G. Smith, Gregorio M. Acosta, Jr., Nicolas J. Acosta, Jorge N. Barragan, Jr., Florentino Castillo, Ernesto Estrada III, and Nicholas W. Thayer of conspiracy to distribute cocaine and cocaine base in excess of 50 grams. The drugs were obtained primarily from sources in Milwaukee and transported to the reservation for distribution and resale by members of the Latin Kings gang operating there. Some of the incoming drugs were handled as "the Nation's Dope," that is, drugs obtained and sold by the Latin Kings with some of the proceeds returning to the gang.

Because of the sprawling scope of this case, the number of defendants, and the variety of issues each raises on appeal, we will initially provide only a brief, general overview of the conspiracy, leaving the necessary details for our analysis of the arguments made by the individual defendants. Beginning in January 1999 and running through December 2003, the Milwaukee Latin Kings gang established and maintained a crack distribution network on the LCO Reservation in collaboration with members of the LCO Latin Kings. Gang members and nonmember coconspirators obtained powder and crack cocaine from various sources—mainly suppliers in Milwaukee but also some in Minneapolis—and transported the drugs to the reservation for "rocking up" (if the cocaine was not already in crack form), packaging, and resale from various drug houses.

The two LCO drug houses central to the charged conspiracy were residences maintained by Yvonne Dennis (together, at various times, with certain of the charged coconspirators) and Gregorio Acosta, Jr. (a "boss" in the Milwaukee Latin Kings and "regional officer" in the LCO Latin Kings), and his wife, Spring Lasieur Acosta. Dennis, Spring Acosta, and two other women figuring prominently in the conspiracy, Candace Radermacher (wife of John Radermacher) and Jacqueline Martinson (girlfriend of Jorge Barragan), were charged separately.

The illicit activities of the LCO Latin Kings crack conspiracy were facilitated by an organizational structure typical of the Latin Kings—led by an "Inca," with a "Cacique" as the second-in-command, and an Enforcer who addressed violations of Latin Kings law. "Shorties" were adolescents too young to be full-fledged gang mem-

bers, but who could work their way up to membership by doing the bidding of more senior members of the gang. The core gang members would hold semiformal meetings (or "demos") at which they would discuss (among other things) the details of the drug distribution operation and receipt of its proceeds.

## II.  Analysis

### A.  Gregorio Acosta, Jr.

Gregorio Acosta, Jr., was charged with conspiracy to distribute cocaine and cocaine base and several counts of distribution of cocaine and cocaine base. He pleaded guilty to the conspiracy count and was sentenced to 339 months, the bottom of the advisory sentencing guidelines range of 360 months to life, minus 21 months he spent in state prison for related drug-trafficking conduct.

A "boss" in the Milwaukee Latin Kings, Gregorio supplied powder and crack cocaine to the LCO Latin Kings organization from early in January 1999 until his imprisonment on state drug charges in January 2001. He also maintained a residence on the LCO Reservation from which crack was sold to retail customers. After his release from state prison in October 2002, he resumed crack-cocaine trafficking (there was evidence that he remained involved in the conspiracy while he was in prison), and this continued until his arrest on the charges in this case in August 2003. Apart from the basic concessions made in his guilty plea, the specifics of Gregorio's role in the conspiracy—and hence, the evidentiary basis for the district court's drug-quantity findings, which he chal-

lenges—were established largely through the statements and trial testimony of his wife, Spring Lasieur Acosta.

Spring, a "Latin Queen," was involved in the LCO Latin Kings drug conspiracy essentially from its inception. In 1997 Spring Lasieur met and started dating coconspirator Jorge Barragan, a member of the Milwaukee Latin Kings. Through him she met coconspirator Florentino Castillo, also a Latin Kings gang member, and coconspirator Ernesto Estrada III, Barragan's cousin. In late 1998 or early 1999, Barragan, Castillo, and Estrada began making regular trips to the LCO in connection with the establishment of a "region" between the Milwaukee and LCO Latin Kings for the distribution of crack cocaine. Gregorio Acosta, his brother Nicolas Acosta, Barragan, and Castillo (among others) were initial "regional members" of the LCO Latin Kings "region." Spring did not meet Gregorio, her future husband, until mid-1999; by then the Milwaukee Latin Kings had established a foothold on the LCO Reservation and, with LCO Latin Kings members, were distributing large amounts of crack there.

From January 1999 to August 1999, Spring made regular drug-running trips with Estrada in furtherance of the LCO crack-distribution conspiracy, traveling from Milwaukee to the reservation at least twice a week with between one and four ounces of "mostly formed cocaine—crack cocaine" and, on some trips, large quantities of marijuana. Gregorio moved from Milwaukee to the LCO sometime in 1999, and in August 1999 Estrada introduced Gregorio to Spring. At that point, Spring testified, Gregorio had already been involved in supplying cocaine to the LCO Latin Kings for some time. From September 1999 to January 2000, Spring and

Gregorio, occasionally accompanied by Estrada, traveled between Milwaukee and the LCO two or three times a week, bringing between three and four ounces of powder and crack cocaine to the reservation on each trip. In December 1999 Spring became pregnant with Gregorio's child, and the couple married in 2000.

Spring testified that from January 2000 to January 2001, Gregorio traveled to Milwaukee at least every three weeks or so, returning to the LCO with between one and four ounces of cocaine on each trip. Spring and Gregorio's residence on the LCO served as a drug house from which they, Castillo, and Nicolas Acosta would prepare, package, and sell crack cocaine to users on the reservation. In March 2000 Gregorio was arrested in Washburn County, Wisconsin, in possession of 30 grams of crack. He was released on bond and resumed cocaine trafficking. In January 2001 he was convicted and sentenced to prison on state drug charges stemming from the Washburn County arrest. He was released from prison in October 2002 and resumed selling crack cocaine with Spring, resupplying as needed from Milwaukee. This activity continued until his arrest in August 2003.

Various aspects of Spring's testimony were corroborated by other coconspirators—most notably, according to the district court, Candace Radermacher, Donald Fairbanks, and Sundown Doney (a member of the LCO Latin Kings), among others. Gregorio's presentence report ("PSR") also described controlled buys of crack from Gregorio at the Lasieur-Acosta drug house in July 2003, and the recovery of a quarter kilogram of cocaine that had not yet been "rocked up" (converted into crack) in their house at the time of Gregorio's August 2003 arrest.

Gregorio argues on appeal that the district court improperly denied him the two-level sentencing guidelines adjustment for acceptance of responsibility, *see* U.S.S.G. § 3E1.1, because the court considered his objections to the PSR's relevant-conduct analysis to be frivolous. The government initially recommended that the court consider Gregorio's acceptance of responsibility but withdrew that recommendation based on his objections to the PSR. The district court's decision to deny credit for acceptance of responsibility is reviewed for clear error. *United States v. Lister*, 432 F.3d 754, 758 (7th Cir. 2005).

The commentary to the acceptance-of-responsibility guideline suggests that "a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." U.S.S.G. § 3E1.1 cmt. n.1(a). We have said that "a defendant should not be denied a reduction for acceptance of responsibility when he only challenges the *legal conclusion* that should be drawn from facts that he has admitted." *United States v. Booker*, 248 F.3d 683 (7th Cir. 2001) (citing *United States v. Purchess*, 107 F.3d 1261, 1266 (7th Cir. 1997) (emphasis added)). Further, in *Purchess*, we observed that "where the defendant remains otherwise silent as to relevant conduct but his lawyer challenges certain facts alleged in the PSR, we think the court should attempt to ensure that the defendant understands and approves the argument before attributing the factual challenges in the argument to the defendant for purposes of assessing acceptance of responsibility." 107 F.3d at 1268. We have recently emphasized that *Purchess* is best understood as requiring the sentencing court to attempt to clarify the defendant's

understanding of relevant-conduct objections only where there is reason to believe the defendant might be confused or disagrees with counsel. *See United States v. Chen*, 497 F.3d 718, 720-21 (7th Cir. 2007); *Lister*, 432 F.3d at 760.

Gregorio's objections to the PSR's relevant-conduct determination were factual, not legal; he challenged the drug-quantity amounts attributable to him during different phases of the conspiracy. Furthermore, there is nothing in the record to indicate he was confused about or disagreed with his counsel's objections to the PSR's relevant-conduct analysis. Judge Crabb asked him if he had read the PSR and its addendum, and inquired whether there was anything he objected to that his attorney had not already raised in his written objections. Gregorio confirmed that he had read the documents and had nothing to add. Following lengthy arguments from the government and Gregorio's counsel, Judge Crabb credited Spring Acosta's testimony, found it corroborated by coconspirators, and held that a "reasonable and fair estimate" of Gregorio's relevant conduct involved "well in excess of 1.5 kilograms of cocaine base or crack cocaine." As we will explain in a moment, this finding is amply supported by the record. Accordingly, it was not clear error for the district court to conclude Gregorio had frivolously contested relevant conduct and deny his request for the two-level adjustment for acceptance of responsibility.

Gregorio also claims several due-process violations based on the district court's determination of drug quantity. Gregorio's argument rests in part on Judge Crabb's reference to having sat through the trial of certain other defendants and heard substantial evidence to support a

finding of 1.5 kilograms of crack. Gregorio takes this to mean that the district court relied on information unavailable to him and thus deprived him of notice and the opportunity to respond. The government notes in response that before sentencing, Gregorio was provided all the excerpts of trial testimony on which the government intended to rely for the determination of relevant conduct. Gregorio acknowledges this, but suggests that Judge Crabb's comment might mean she considered other parts of the trial testimony not available to him. This is sheer speculation, and in any event, of no consequence; the district court does not violate the due-process rights of a coconspirator who pleads guilty by relying, for sentencing purposes, on evidence presented at the trial of coconspirators. Gregorio was on notice that under the sentencing guidelines, he would be held responsible for the relevant conduct of his coconspirators if reasonably foreseeable to him (more on this point later). *See* U.S.S.G. § 1B1.3(a)(1)(B). We reject this aspect of Gregorio's due-process argument.

Gregorio also contests the reliability of the evidence related to drug quantity, framing his argument as a due-process challenge. *See United States v. McEntire*, 153 F.3d 424, 435-37 (7th Cir. 1998); *United States v. Townsend*, 73 F.3d 747, 751 (7th Cir. 1996) ("[A] defendant has a due process right to be sentenced on the basis of accurate information."). "Due process is specifically satisfied when the district court determines the quantity of drugs attributable to a defendant by a preponderance of the evidence . . . [using information that] has 'sufficient indicia of reliability to support its probable accuracy.'" *Townsend*, 73 F.3d at 751 (quoting *United States v.*

*Ewers*, 54 F.3d 419, 421 (7th Cir. 1995) (other citations omitted)). Here, the district court relied primarily on the trial testimony of Spring Lasieur Acosta, as corroborated by Candace Radermacher and other coconspirators. (Spring Acosta pleaded guilty and was herself held responsible for more than 1.5 kilograms of cocaine. *See Acosta*, 474 F.3d at 1001.) This sort of sentencing information plainly carries "sufficient indicia of reliability" to satisfy due-process minimums. We think Gregorio is using the language of due process to make what is really a challenge to the factual sufficiency of the district court's drug-quantity determination.

The district court's factual findings regarding drug quantity are reviewed under the deferential clear-error standard. *United States v. Cross*, 430 F.3d 406, 410 (7th Cir. 2005). A factual finding is clearly erroneous "only when, on the entire evidence, the reviewing court is left with the definite and firm conviction that a mistake has been committed." *United States v. Johnson*, 227 F.3d 807, 813 (7th Cir. 2000) (quotations omitted). Drug quantity for purposes of determining the applicable sentencing guideline may be established by the use of reasonable estimates. *United States v. Joiner*, 183 F.3d 635, 640 (7th Cir. 1999). In the case of jointly undertaken criminal activity, the sentencing guidelines direct that the relevant-conduct determination should take account of "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity," *see* U.S.S.G. § 1B1.3(a)(1)(B), whether or not charged as a conspiracy. *Booker*, 248 F.3d at 688. This requires the sentencing court to "assess the reasonable foreseeability of [the drug sales of other conspiracy members], inquiring into the

scope of the criminal activity the defendant agreed to undertake jointly." *United States v. Brumfield*, 301 F.3d 724, 733 (7th Cir. 2002).

The government asserted (consistent with the PSR's recommendation) that Gregorio should be held responsible for more than 1.5 kilograms of crack, for a base offense level of 38, *see* U.S.S.G. § 2D1.1 (2005), based on Spring Lasieur Acosta's testimony about the amounts trafficked during several distinct time periods before Gregorio was imprisoned on state drug charges in January 2001. The first time period commenced in January 1999 when the Latin Kings first began to run cocaine from Milwaukee to the LCO for distribution on the reservation and ran through August 1999 when Spring was introduced to Gregorio and began to transport drugs with him. Spring testified that she and Estrada made at least two trips per week during this time frame, carrying between one and four ounces of "mostly formed cocaine—crack cocaine." Using an average of two ounces per trip and approximately 64 trips from January to August 1999, the total for this time period was 3,628 grams of crack cocaine.

The second discrete time period identified by the government was September 1999, after Gregorio and Spring met, to January 2000. Spring testified that during this time period she and Gregorio, sometimes accompanied by Estrada, ran drugs from Milwaukee to the LCO approximately twice a week, carrying three to four ounces of both powder and crack cocaine each time. Using the low-end estimate of three ounces and assuming half was crack cocaine, the total for 32 trips (approximately 16 weeks, two trips per week) was 1,360 grams of crack cocaine.

The third time period in the government's relevant-conduct calculation was January 2000 through January 2001 when Gregorio was convicted on state drug charges and began serving a short prison sentence. Spring testified that during this time period, Gregorio went to Milwaukee every three weeks and returned with between one and four ounces of crack and powder cocaine each time. She also testified that their house on the LCO was being used as a drug house from which crack cocaine was regularly sold; cocaine that arrived on the LCO as powder was converted to crack and resold there. Using a conservative estimate of two ounces per trip over 17 trips totaled just over 960 additional grams of crack cocaine.

These quantities together amount to approximately 5,948 grams of crack cocaine, far exceeding the 1.5 kilograms required for offense level 38, as found by the district court. Even including only those quantities attributable to Gregorio personally (as opposed to coconspirators whose trafficking activity was reasonably foreseeable to him) would total more than 2,320 grams, still well in excess of the 1.5 kilograms needed for offense level 38. These calculations are extraordinarily conservative, omitting *entirely* the drug quantities Gregorio trafficked after his release from prison in October 2002, for which there were no specific estimates but undoubtedly were attributable to him as relevant conduct.

Gregorio cites a number of infirmities in the record evidence underlying the district court's relevant-conduct determination. First, he points to inconsistent statements Spring made regarding precisely when she started transporting cocaine to the LCO. This is insufficient to under-

mine the district court's findings. By specifically crediting Spring's testimony, Judge Crabb implicitly disregarded inconsistencies as to some of its particulars, which is not at all uncommon.

Second, Gregorio argues there is no basis to attribute the amounts trafficked before August 1999 to him. To the contrary, Gregorio's involvement in crack-cocaine trafficking at the LCO during this time period was established by the following evidence: (1) his status as a "boss" in the Milwaukee Latin Kings and early role as a "regional officer" of the Milwaukee/LCO Latin Kings "region" established for the purpose (among others) of crack distribution on the reservation; (2) Spring's statements about Gregorio's preexisting involvement in the crack distribution network at the LCO before they met in August 1999; and (3) Gregorio's arrest in Sawyer County in June 1999 in possession of $3,000 in cash during a traffic stop by Hayward, Wisconsin police. This is strong circumstantial evidence of his involvement in the conspiracy prior to August 1999, making the amounts trafficked by coconspirators during that time period reasonably foreseeable to him. In any event, Judge Crabb did not attribute the drug quantities from *all* of 1999 to Gregorio. She began her estimation of relevant conduct by assuming he was involved in the conspiracy from June 1999 until "early 2001," when he went to prison. Even leaving aside the January-August 1999 quantities in their entirety, the total remains well in excess of 1.5 kilograms of crack cocaine.

Finally, Gregorio argues that Spring provided vague and potentially conflicting information about the amount of crack versus powder cocaine transported from Mil-

waukee to the reservation. Again, the district court explicitly credited Spring's testimony, resolving any discrepancies in favor of accepting the government's argument and rejecting Gregorio's. We "defer[ ] to the district court's determination of witness credibility, which can virtually never be clear error." *United States v. Noble*, 246 F.3d 946, 953 (7th Cir. 2001). The estimating method proposed by the government was reasonable, erring as it did on the side of understating, not overstating, the drug quantities attributable to Gregorio. The district court's finding that Gregorio Acosta was involved in a conspiracy to distribute in excess of 1.5 kilograms of crack cocaine, for a base offense level 38, was not clearly erroneous.[1]

## B. Nicolas J. Acosta

Nicolas J. Acosta pleaded guilty to the conspiracy count in the indictment. He admitted assisting his brother Gregorio and sister-in-law Spring sell crack from their house on the LCO reservation during 2000 and part of 2001. He received a sentence of 151 months, the bottom of an advisory sentencing guidelines range of 151 to 188 months.

On appeal, Nicolas challenges the district court's findings related to drug quantity and other conduct attributed to

---

[1] Gregorio makes one additional argument solely to preserve the issue. He argues drug quantity should be proved beyond a reasonable doubt. We have rejected this argument, *see United States v. James*, 487 F.3d 518, 528-29 (7th Cir. 2007), and do so again.

him for purposes of sentencing. First, Nicolas contends the district court erred by holding him responsible for more than 1.5 kilograms of crack cocaine. As with Gregorio Acosta, the district court based this finding largely on estimates provided by Spring Acosta. The court found that Nicolas assisted his brother and sister-in-law in selling crack from their house between November 1999 and August 2001.

Nicolas attacks Spring's credibility as a general matter, but as we have already noted, arguments of this nature are insufficient to establish clear error. The district court had the opportunity to assess Spring's testimony and evaluate her truthfulness; we defer to the court's weighing of the evidence and will not second-guess credibility determinations. *Noble*, 246 F.3d at 953*.*

More specifically, Nicolas points to an inconsistency in Spring's estimates of the amount of cocaine brought to the reservation and the amount sold from the Lasieur-Acosta residence. To repeat, Spring testified that from September 1999 to January 2000, she and Gregorio would go to Milwaukee two or three times per week, returning to the reservation with three or four ounces of powder and crack cocaine each time; she also said that from January 2000 to January 2001, Gregorio would travel to Milwaukee every three weeks and bring back between one and four ounces each trip. Her estimates of the amounts sold from their residence on the reservation differ; she said they sold about one to two ounces of powder and crack cocaine from the residence every two or three weeks. Nicolas seizes on this discrepancy between the higher volume Spring said she and Gregorio transported to the LCO from Milwaukee and the amounts she said they sold from the Lasieur-Acosta residence.

This discrepancy is not fatal to the district court's drug-quantity finding. Nicolas's PSR stated that Gregorio distributed "to the LCO Community" the drugs he brought to the reservation from Milwaukee. This does not suggest that *all* the drugs Gregorio transported from Milwaukee were sold *only* from the drug house he operated with Spring. The evidence established that the LCO Latin Kings operated other drug houses on the reservation as well and (as we shall see) other members of the conspiracy were also involved in running drugs from Milwaukee. The evidence also established that the crack-cocaine trafficking by the LCO Latin Kings continued—at the Lasieur-Acosta residence and other locations on the reservation—after Gregorio went to prison.

Nicolas also contends the district court meant to attribute to him only the drug amounts sold from the Lasieur-Acosta residence on the LCO, not the higher drug amounts Gregorio transported from Milwaukee to the LCO. Nicolas focuses on the following comment by Judge Crabb at sentencing: "It's very possible that you [Nicolas] didn't know how much your brother was bringing up [to the reservation] on every occasion, but you were in a position to know and were up at the reservation enough to know what was being sold out of the house." Nicolas claims this demonstrates that the court meant to hold him accountable only for amounts sold from the Lasieur-Acosta residence.

Nicolas reads too much into this single comment by the district court. As we have explained, "[i]n a drug conspiracy each conspirator is responsible not only for drug quantities directly attributable to him but also for amounts involved in transactions by coconspirators that were

reasonably foreseeable to him." *United States v. McLee*, 436 F.3d 751, 765 (7th Cir. 2006). By his own admission, Nicolas was a knowing and active participant in the larger drug conspiracy at the heart of this prosecution. He assisted Gregorio and Spring in selling crack and powder cocaine from their home and, indeed, continued to facilitate sales there after his brother's imprisonment in early 2001. The government argued (and the PSR recommended) that the drug quantities Gregorio transported to the reservation were reasonably foreseeable to Nicolas; these amounts, as we have already noted, easily topped 1.5 kilograms.

When considered in context, Judge Crabb's remark was simply an acknowledgment that Nicolas may not have known the precise quantity of drugs Gregorio transported, but those amounts were nevertheless "reasonably foreseeable" to him because he was "in a position to know" and certainly knew how much was being sold out of the Lasieur-Acosta residence alone, not to mention elsewhere on the reservation. The district court found that Nicolas was a "committed member" of the Latin Kings gang who "assisted in a criminal conspiracy to distribute drugs that devastated the Lac Courte Oreilles Reservation." The actions of coconspirators are reasonably foreseeable by Nicolas if he "demonstrated a substantial degree of commitment to the conspiracy's objectives, either through his words or his conduct." *United States v. Zarnes*, 33 F.3d 1454, 1474 (7th Cir. 1994) (quoting *United States v. Edwards*, 945 F.2d 1387, 1393-94 (7th Cir. 1991)) (explaining that the most important factor in determining reasonable foreseeability is the defendant's substantial degree of commitment to the conspiracy's objectives). Judge Crabb

emphasized that this conspiracy involved such large quantities of cocaine and crack cocaine that even if she limited Nicolas's relevant conduct to just the year 2000, she would be "forced to conclude that you were responsible for one and a half kilograms and, you know, more than that probably . . . [,] a good deal more than that if we take into account any of the other years that you were involved." The district court did not commit clear error in attributing in excess of 1.5 kilograms of crack cocaine to Nicolas.

Finally, Nicolas argues that the district court should have given him a four-level reduction under U.S.S.G. § 3B1.2 for being a "minimal participant" in the conspiracy, instead of just the two-level "minor participant" reduction he received. We review this determination for clear error. *United States v. Peterson-Knox*, 471 F.3d 816, 824 (7th Cir. 2006); *United States v. Hankton*, 432 F.3d 779, 793 (7th Cir. 2005). The commentary to § 3B1.2 describes a minimal participant as one who "plays a minimal role in concerted activity" as evidenced by his "lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others." U.S.S.G. § 3B1.2 cmt. n.4. The commentary further instructs that a downward adjustment based on a defendant's minimal participation is to be applied "infrequently." *Id.* A minor participant, in contrast, is one "who is less culpable than most other participants, but whose role could not be described as minimal." *Id.* at cmt. n.5.

As we have already discussed, although the district court noted that Nicolas may not have known the precise quantity of cocaine his brother Gregorio was bringing to the LCO, he was "in a position to know" and

was "up at the reservation enough to know what was being sold out of the house." The court noted that although Nicolas was "less involved in the conspiracy than other participants," he was involved for "a considerable period of time," actively assisting "in the conspiracy between November 1999 and August 2001." Even after his brother went to prison, Nicolas continued to sell crack at the Lasieur-Acosta residence together with coconspirators Pedro Zamora, Donald Fairbanks, Castillo, and Barragan. The district court's decision to award the two-level "minor participant" adjustment rather than the four-level "minimal participant" adjustment was not clearly erroneous.

## C. Donald Fairbanks

Donald Fairbanks pleaded guilty to counts 2 and 3 of the indictment, admitting to maintaining a crack house and distributing cocaine base. Like the other defendants, the district court held Fairbanks responsible for in excess of 1.5 kilograms of crack cocaine. Fairbanks received a guidelines adjustment for substantial assistance to the government, which reduced his advisory guidelines range to 235 to 293 months (from an original range of 360 months to life). He was sentenced to the bottom of the range, 235 months.

Fairbanks challenges the district court's drug-quantity determination, arguing that the district court "indiscriminately" held him responsible for the activities of others in "a murky, undefined conspiracy." His argument relies heavily on *United States v. Bullock*, 454 F.3d 637 (7th Cir. 2006), but that case is readily distinguishable. In *Bullock*,

the defendant was convicted of distributing heroin and was held responsible for relevant conduct related to a crack-distribution conspiracy carried out by other members of his criminal gang. It was not self-evident why the crack conspiracy's operations should be attributed to the defendant because his criminal activities took place in a different location and at a different time; in addition, the defendant's PSR concluded that there was no direct evidence linking the defendant to the conspiracy.

Here, in contrast, the PSR reported—and this was not disputed—that Fairbanks was a longtime member of the LCO Latin Kings and in 2000 and part of 2001, held the position of Cacique (the number two position) in the gang. He attended demos at which members of the gang discussed drug resupply needs and decided who would distribute the drugs. He collected and distributed drug money and referred customers to a coconspirator multiple times. With Pedro Zamora and John and Candace Radermacher, he cooked, packaged, and sold crack and otherwise helped operate the Yvonne Dennis drug house on the LCO reservation. During the two-year period from 2000 to 2002, two runners alone—Jacqueline Martinson and Rebecca Corbine—provided the LCO Latin Kings with at least one ounce of cocaine per week in the form of crack and powder. The powder cocaine was cooked into crack for resale from the Yvonne Dennis crack house. There is much more, but this summary is sufficient to demonstrate Fairbanks's integral role in the conspiracy.

The foregoing facts, adopted by the district court from the PSR, were derived from statements and testimony of Spring Acosta, Candace Radermacher, Martinson, Corbine, Dennis, and other coconspirators. The district

court's finding that Fairbanks was responsible for in excess of 1.5 kilograms of crack cocaine was not clearly erroneous.

Fairbanks next challenges the district court's findings regarding his use of underage sellers and the application of a weapons enhancement. Fairbanks received a guidelines enhancement under U.S.S.G. § 3B1.4 for using minors to commit his crimes. The minors, or "shorties" as they are called in Latin King parlance, were adolescents who aspired to become full members of the Latin Kings. Gang members used these wannabes for various purposes, including to sell crack cocaine. The district court found Fairbanks was responsible for using two minors identified in the PSR as Ray Quagon and Michael Blackdeer.

We recently elaborated on what it means to "use" a minor for purposes of receiving the use-of-a-minor enhancement under § 3B1.4 in the related LCO Latin Kings case involving Spring Acosta and Candace Radermacher. *See Acosta*, 474 F.3d at 1003. In *Acosta*, we concluded that insofar as § 3B1.4 contemplated an *individualized* enhancement, it was intended to punish "the particular behavior of individual members of a conspiracy." *Id.* That is, to receive the enhancement, the defendant himself must have used minors in the commission of his crime. *Id.*

Fairbanks's argument—a lone paragraph without any citation to case law—is that "the evidentiary basis, as attested to by the 'shorties' themselves, is that Fairbanks never utilized them, period." While it is true that Quagon's and Blackdeer's statements do not specifically reference Fairbanks, they also do not affirmatively deny working with him. The PSR elsewhere substantiates Fairbanks's *personal* use of these shorties: Martinson reported that

Fairbanks supplied crack to others, specifically including Quagon and Blackdeer, for redistribution on the reservation. Distributing drugs directly to minors for further distribution qualifies as the type of personal use of a minor warranting application of the use-of-a-minor enhancement under § 3B1.4.

This leaves Fairbanks's claim that the district court improperly added a two-level dangerous-weapon enhancement under U.S.S.G. § 2D1.1(b)(1). A sentencing court properly adjusts a sentencing guidelines range for weapon possession "if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1 cmt. n.3. Once the government has proved possession, the defendant must show it is clearly improbable that the weapon was connected with the offense. *United States v. Johnson*, 289 F.3d 1034, 1042 (7th Cir. 2002). Contrary to Fairbanks's suggestions, the court need not have found that Fairbanks himself possessed or used a weapon—here, multiple firearms. He is considered to have "possessed" a firearm if coconspirators possessed firearms in furtherance of the conspiracy and Fairbanks could have reasonably foreseen the coconspirators' possession. *United States v. Harris*, 230 F.3d 1054, 1057 (7th Cir. 2000). The PSR identifies numerous coconspirators who possessed firearms and had multiple contacts with Fairbanks, including the Radermachers, Corbine, and Quagon. The application of the two-level weapon enhancement was not clear error.

### D. Jorge Barragan, Jr.

Jorge Barragan, Jr., went to trial and was found guilty on the conspiracy count. The district court found him respon-

sible for in excess of 1.5 kilograms of crack, for a base offense level of 38, and added the two-level weapon enhancement, yielding (when combined with his lengthy criminal history) an advisory guidelines range of 360 months to life. Barragan was sentenced to 312 months, the bottom of the advisory range minus the time he had already spent in custody. On appeal, Barragan challenges the district court's drug-quantity determination and the application of the weapons enhancer.

The district court found Barragan responsible for more than 1.5 kilograms of crack cocaine, in accordance with the recommendation in the PSR, based on the significance of his role in the conspiracy. Barragon, a member of the Milwaukee Latin Kings, began dating Spring Lasieur in 1997, and by late 1998 was traveling regularly to the LCO with her and selling marijuana on the reservation. In late 1998 or early 1999, the Milwaukee and LCO Latin Kings began to set up their "region" for the purpose of distributing cocaine on the reservation; as we have already noted, Barragan was an early "regional member" of this organization. He started dating Jacqueline Martinson in late 1999 or early 2000, and the two began to transport powder and crack cocaine from Milwaukee to the LCO on a regular basis. Martinson gave birth to Barragan's child in December 2000, but continued to make Milwaukee/LCO cocaine resupply runs for him in 2001 while Barragan sold crack from the Lasieur-Acosta residence after Gregorio Acosta went to prison in January 2001. Evidence at trial also established that Barragan cooked powder cocaine into crack at a drug house operated by Richard Saddler, a coconspirator who was convicted in a separate case. Barragan was imprisoned on a gun charge in December 2001, but referred Martinson to a new source of cocaine

from prison so she could continue the supply of drugs to the LCO crack conspiracy.

Barragan conceded for sentencing purposes certain drug quantities relating to specific incidents of distribution involving coconspirators Castillo, Corbine, Fairbanks, and Gregorio Acosta; these quantities totaled 171.75 grams of crack, and we need not discuss this amount any further. Martinson testified to making approximately 12 trips with Barragan from Milwaukee to the reservation in 2000, carrying a half-ounce to an ounce each of powder and crack cocaine on each trip. The government reasonably suggested using the low-end estimate of a half-ounce of crack per trip, for a total of just over 170 additional grams of crack. Martinson's drug runs for Barragan in 2001 involved similar amounts; Candace Radermacher (who replaced Fairbanks as Cacique sometime that year) estimated their frequency at about three a month. Thirty-six trips at a half-ounce of crack per trip raised the total by an additional 510 grams of crack.

The government also argued that the crack amounts transported by Gregorio Acosta from Milwaukee to the LCO from January 2000 to January 2001 were reasonably foreseeable to Barragan based on his prominent role in and awareness of the operation of the conspiracy. This added just over 960 grams of crack to the drug-quantity total. Finally, the government argued Barragan should be held accountable for the crack Martinson supplied to the conspiracy from January 2002 to May 2002 because he referred her to an alternative source for this time period while he was in prison. Martinson testified to approximately 20 resupply trips during this period involving two to six ounces of powder and crack cocaine each trip.

Again using the low-end estimate of two ounces of crack per trip, this added another 1,134 grams, for a grand total of 2,949.75 grams of crack cocaine.

The district court did not fix the drug quantity quite so specifically, but its finding that Barragan was involved in trafficking in excess of 1.5 kilograms of crack was not clearly erroneous. Barragan attacks the government's method of estimating crack (as opposed to powder) amounts, but we have already concluded that it understated rather than overstated drug quantity and was therefore reasonable. Like Gregorio Acosta, Barragan also challenges the reliability of the witnesses' testimony, but again, we defer to the district court's evaluation of witness credibility and the weight of the evidence. Finally, Barragan contests the inclusion of Martinson's drug-running in 2002, while he was in custody, as not reasonably foreseeable to him. We disagree, but even excluding those amounts leaves a drug-quantity total in excess of 1.5 kilograms of crack. Given the scale of this conspiracy, we think this is a very conservative estimate. We reject Barragan's challenge to the district court's drug-quantity findings.

Barragan's last argument concerns his weapon enhancement under U.S.S.G. § 2D1.1(b)(1). Barragan was stopped by police on December 10, 2001; the police searched his van and found a disassembled machine gun and two revolvers. It is undisputed the machine gun was owned by the Latin Kings. Barragan argues there was no evidence the guns were related to the sale of drugs. This is not so; there was plenty of circumstantial evidence. The guns were found during the time frame of the conspiracy, one of the weapons was owned by the gang

responsible for the illicit activities of the drug conspiracy, and the guns were found in Barragan's van when he was making a trip from the LCO to Milwaukee, where the LCO Latin Kings regularly obtained its supply of drugs. The burden is on Barragan to show that it was "clearly improbable" that the guns were connected to the conspiracy, and he has failed to discharge that burden.

### E.  Ernesto Estrada III

The jury found Ernesto Estrada III guilty of conspiracy, and he was sentenced to 292 months in prison. As we have already discussed, he was an early participant in the conspiracy, making frequent drug runs with Spring Lasieur from Milwaukee to the LCO between January and August of 1999 and, more intermittently, from September 1999 to January 2000 with Spring and Gregorio Acosta. On appeal, Estrada challenges only the district court's drug-quantity finding. As with the other defendants, the district court found Estrada responsible for in excess of 1.5 kilograms of crack. Estrada's points of error resemble those we have already rejected; we need not repeat them here. At the very least, Estrada was directly responsible for transporting 3,628 grams of crack to the LCO from January to August 1999—much more if the trips between September 1999 and January 2000 are counted. The district court's drug-quantity finding was not clearly erroneous.

### F.  Florentino Castillo

The jury convicted Florentino Castillo of conspiracy, and he was sentenced to a term of 322 months, the bottom

of the applicable guidelines range of 360 months to life minus the time he spent in state custody for related conduct. On appeal, Castillo purports to adopt various arguments of his coappellants, but makes no effort to apply the relevant legal standards or analysis to his particular circumstances. Absent this necessary development, his arguments are waived. *See United States v. Turcotte*, 405 F.3d 515, 536 (7th Cir. 2005).

To the extent Castillo is mounting a challenge to the district court's drug-quantity finding similar to those of his codefendants, we reject it for the reasons we have already stated. The evidence at trial established that Castillo's involvement in this conspiracy began in 1998 with frequent trips from Milwaukee to the LCO as the Milwaukee/LCO Latin Kings crack distribution "region" was being established. While Spring Lasieur, Estrada, and Gregorio Acosta were making drug runs from Milwaukee to the LCO in 1999 and 2000, Castillo and Estrada were selling the crack cocaine to users at parties on the reservation. Beginning in January 2001 when Gregorio went to prison, Castillo sold crack from the Lasieur-Acosta drug house. In 2002 he began to supply Jacqueline Martinson and Rebecca Corbine with powder and crack cocaine for transport from Milwaukee to the LCO. He continued to be a source of cocaine resupply for the conspiracy through the spring of 2003 from dealers in Milwaukee and Minneapolis. Given the duration and scale of this conspiracy and the significant and ongoing role Castilllo played in it, the district court's drug-quantity finding of in excess of 1.5 kilograms of crack cocaine was not clearly erroneous.

**G. Pedro Zamora**

The jury found Pedro Zamora guilty of the conspiracy count and one count of maintaining a drug house for his role in operating the Yvonne Dennis crack house. He was sentenced to a term of 360 months on the conspiracy count, the bottom of the applicable guidelines range of 360 months to life, and a concurrent 240 months for the conviction for maintaining a drug house.

Zamora first challenges the district court's denial of his Rule 29 motion for acquittal based on insufficient evidence that he maintained a drug house in violation of 21 U.S.C. § 856(a)(1). Our review of a district court's denial of a Rule 29 motion is de novo. *See United States v. Hendrix*, 482 F.3d 962, 966 (7th Cir. 2007). Zamora's burden on appeal is a heavy one; he must convince this court that even drawing all inferences in the light most favorable to the government, no rational trier of fact could have found him guilty beyond a reasonable doubt. *Id*.

While Zamora concedes he sold drugs with the Radermachers from Yvonne Dennis's residence, he claims there was insufficient evidence that he "maintained" the drug house. *See United States v. Banks*, 987 F.2d 463, 466 (7th Cir. 1993) (stating that to prove a violation under § 856(a), the government must show that the defendant (1) knowingly (2) opened or maintained his home (3) for the purposes of manufacturing, distributing, or using crack). Zamora stayed there on and off for almost seven months rent free. During that time, he cooked, packaged, and sold crack to customers who came to the house; he also directed Sasha Dennis (Yvonne's daughter) to do the same. On occasion he provided Yvonne Dennis with crack for her personal use.

A variety of factual scenarios may amount to "maintaining" a drug house under § 856(a). For example, an individual "maintains" a drug house if he owns or rents premises, or exercises control over them, and for a sustained period of time, uses those premises to manufacture, store, or sell drugs, or directs others to those premises to obtain drugs. *See, e.g.*, *United States v. Morgan*, 117 F.3d 849 (5th Cir. 1997); *see also United States v. McCullough*, 457 F.3d 1150 (10th Cir. 2006) (defendant "maintained" premises she admitted to owning, using as her primary residence, and at which drugs were located); *United States v. Scull*, 321 F.3d 1270 (10th Cir. 2003) (defendant "maintained" premise he owned where drugs were manufactured and packaged). By contrast, merely living in a house used for drug operations is insufficient. *United States v. Clavis*, 956 F.2d 1079 (11th Cir. 1992). Zamora obviously did not own the premises in question, but that is not dispositive of whether he maintained them. *See, e.g.*, *United States v. Basinger*, 60 F.3d 1400 (9th Cir. 1995) (defendant "maintained" premises for purposes of § 856(a) where he was the only resident and caretaker of property on which he lived during the winter with access to drug-laboratory shed); *United States v. Wood*, 57 F.3d 913 (10th Cir. 1995) (defendant maintained drug premises even though he did not own house and only lived there for two months in summer, but he controlled the room where he resided and stored drugs there). Zamora was far more than a casual visitor. *See Morgan*, 117 F.3d at 857; *United States v. Verners*, 53 F.3d 291, 295-96 (10th Cir. 1995).

Zamora argues that he lived at the Dennis residence because he had nowhere else to stay and, for a time, was

dating Sasha, Yvonne Dennis's daughter. To the extent Zamora is suggesting that he cannot be guilty of maintaining the crack house at Yvonne Dennis's residence because he had other innocent reasons for living there, the jury was entitled to conclude otherwise. He also argues that he sold drugs elsewhere on the reservation, but we fail to see how this is relevant to whether he maintained the Dennis residence for the purpose of distributing crack. His drug dealing at other locations on the reservation is irrelevant provided that buyers knew they could obtain drugs from him at Dennis's house and sought him out there.

Though he did not pay rent, Zamora did provide free crack occasionally to Yvonne Dennis, the owner of the house. The jury could have reasonably inferred these transactions were a sort of quid pro quo for the use of the premises. He stayed overnight at the house—not continually, but on a sustained periodic basis—for seven months. Yvonne Dennis testified Zamora regularly dealt drugs from her front door; Sasha said he would also deal from the living room or a bedroom window. Sasha further testified that if Zamora had somewhere to go, he would leave crack for her to sell. Though Yvonne Dennis exercised ultimate control over the premises, she allowed Zamora to exercise sufficient dominion over the house so as to conduct regular drug transactions there. These facts were sufficient for the jury to find that Zamora maintained the Dennis drug house in violation of § 856.

Zamora also challenges the denial of his Rule 33 motion for a new trial based on the district court's refusal to allow full cross-examination of certain witnesses testi-

fying against Zamora. We review such rulings for abuse of discretion. *United States v. Walton*, 217 F.3d 443, 450 (7th Cir. 2000). Zamora's argument is based on information provided by Spring Lasieur Acosta and Candace Radermacher regarding an arson fire at a residence on the LCO. Though wholly unrelated to this case, the subject of the fire came up during Spring's and Candace's interviews with the FBI, but the district court did not allow the subject to be explored before the jury.

In their interviews with the FBI, Spring and Candace gave varying answers to questions about who set the fire. Spring identified two different people before settling on a third; Candace initially claimed she did not know the arsonist's identity, though she later named the same person as Spring. Zamora thinks these vacillations are evidence of Spring's and Candace's general lack of credibility and his counsel should have been allowed to impeach these witnesses with their statements about the fire. We disagree. As the district court noted, defense counsel had more than sufficient opportunity to impeach the witnesses' credibility. Allowing cross-examination into the origins of the arson fire—particularly given its lack of relevance to the events at issue in this prosecution—would have sidetracked the trial and risked confusing the jury. The district court did not abuse its discretion by excluding this line of questioning.

Finally, Zamora argues that the district court failed to properly consider the sentencing factors of 18 U.S.C. § 3553. Sentences within a properly calculated guidelines range are entitled to a presumption of reasonableness on appeal. *Rita v. United States*, 127 S. Ct. 2456, 2459 (2007); *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005). Zamora asked

for a below-guidelines sentence and now attacks the reasonableness of the sentence he received. He claims that his immaturity and youth warranted a below-guidelines sentence.

Zamora's argument essentially asks us to consider factors that did not persuade the district court in the first instance. Such a request is beyond the scope of reasonableness review. "Our review is deferential to the district court's judgment; 'the question is not . . . what sentence we ourselves might ultimately have decided to impose on the defendant.'" *United States v. Newsom*, 428 F.3d 685, 686 (7th Cir. 2005) (quoting *United States v. Williams*, 425 F.3d 478, 481 (7th Cir. 2005)). Judge Crabb gave specific consideration to a variety of appropriate factors, including Zamora's age, his voluntary participation in the charged crimes, his intermediate role in the drug dealing, his use of minors, his attendance at gang meetings, and the need for incapacitation. Zamora's within-guidelines sentence is presumed reasonable on appeal, and he has failed to rebut the presumption.[2]

## H.  Robert G. Smith

Robert G. Smith pleaded guilty to the conspiracy count charged in the indictment and, after application of several downward adjustments to the advisory guidelines range, was sentenced to 125 months, just above the statutory minimum of 120 months and within the ap-

---

[2]  Zamora, like Gregorio Acosta, makes the additional argument, solely to preserve it, that drug quantity should be proved beyond a reasonable doubt. We again reject this argument. *See* n.1, *supra.*

plicable guidelines range of 120 to 125 months. His attorney filed an *Anders* brief in support of his motion to withdraw as Smith's appointed appellate counsel, and Smith did not file a response to the brief. We have reviewed counsel's *Anders* brief and agree there are no nonfrivolous issues for appeal. The district court properly calculated the sentencing guidelines range, did not clearly err in its factual findings in the determination of relevant conduct, properly considered the applicable guidelines range, and imposed a reasonable sentence after giving due consideration to the § 3553(a) factors. Accordingly, we grant Smith's counsel's motion to withdraw.

### III.  Conclusion

Pedro Zamora's conviction and sentence are AFFIRMED. The sentences of Gregorio Acosta, Nicolas Acosta, Donald Fairbanks, Jorge Barragan, Ernesto Estrada, and Florentino Castillo are AFFIRMED. The motion to withdraw by Robert Smith's counsel is GRANTED.