In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-1611

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHRISTOPHER STRODE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 06 CR 0082—**Sarah Evans Barker**, *Judge.*

ARGUED OCTOBER 29, 2008—DECIDED JANUARY 14, 2009

Before POSNER, MANION, and KANNE, *Circuit Judges.*

MANION, *Circuit Judge.* After a five-day trial, a jury convicted Christopher Strode of two counts of conspiring to possess with the intent to distribute 1,000 kilograms or more of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846, one count of manufacturing with the intent to distribute 100 marijuana plants in violation of 21 U.S.C. § 841(a)(1), and two counts of money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1957. The

district court sentenced Strode to 192 months' imprison-ment. Strode appeals, challenging his sentence. We affirm.

I.

Strode operated a large-scale marijuana distribution ring in Indianapolis, Indiana, from 2002 until November 2004. His source of supply was in Phoenix, Arizona, though he also was in the process of growing large quanti-ties of marijuana in a house he owned in Indianapolis. Strode had his associates make numerous trips transport-ing tens of thousands of dollars in cash to Phoenix, where they exchanged the cash for marijuana and transported the marijuana back to Indianapolis. Their preferred method for hauling the marijuana was using caravans of rental cars. In early 2003, Strode joined forces with John Conway, another distributor who had been selling mari-juana in Indianapolis since 2001, to expand the operation for shipment of marijuana from Phoenix to Indianapolis.

At trial, several witnesses discussed the quantity of marijuana that the trips to Phoenix yielded. Conway testified that, from 2003 to the end of 2004, he and Strode transported between 20,000 and 30,000 pounds of mari-juana from Phoenix to Indianapolis. William Askew, an associate of Conway's, testified about several trips he made transporting marijuana with Strode from Arizona to Indiana. Payton Blackwell, an associate of Strode's, stated that Strode paid him a "pound of weed" to transport $70,000 to Arizona in January 2003. After that first trip, Blackwell continued to transport large amounts of cash for Strode. He further stated that, in addition to transporting

cash, he began escorting the marijuana back to Indianapolis once a week at the end of March 2003 and, after he lost his job in August 2003, two to three times a week. According to Blackwell, he helped Strode transport marijuana for eleven months, and the smallest load of marijuana he helped transport was around three hundred pounds. In addition, Blackwell testified that in December 2003 he participated in a ten-car caravan transporting marijuana from Phoenix to Indianapolis. Finally, both John Berndt and Samuel Standard, two of Strode's other drug couriers, testified about the multiple trips they made transporting marijuana on Strode's behalf. Berndt made three trips from Indianapolis to Phoenix and back, transporting over fifty pounds of marijuana in a rental car each time, while Standard made two.

The government presented hotel, airline, and car rental records that corroborated the testimony of Conway, Blackwell, and Askew about many of the trips to Arizona. The government also presented evidence of several seizures of marijuana and cash by law enforcement officers. For example, Texas State Trooper Oscar Esqueda testified that he seized 89 pounds of marijuana from a Ford Taurus driven by Martin Allen, another of Strode's couriers. Allen's vehicle was part of a three-car convoy transporting marijuana from Arizona to Indianapolis. On another occasion, Esqueda stopped Standard and seized 257 pounds of marijuana from the rental car Standard was driving. Shortly thereafter, another state trooper pulled over a rental car that appeared to be traveling in tandem with Standard; Strode was driving that vehicle.

A grand jury indicted Strode in May 2006 along with six others, including Conway and Askew. Strode was arrested but later released pending trial, subject to several conditions. One of the conditions of Strode's release forbade contact with any of his co-defendants or potential witnesses. A few months later, on November 3, 2006, Strode happened upon Conway at the Indianapolis City-County Building where Conway was attempting to pay his child support. Despite the court's no-contact condition, Strode approached Conway and told him that they needed to meet to get their stories straight. Later that same day, Strode, Conway, and Askew met at Glover's Auto Sales in Indianapolis. At the meeting, Strode acknowledged that he was subject to the no-contact order, that they "ain't supposed to be havin' this conversation right now," and that if the government found out about their meeting they could be detained until the end of trial. A good portion of the protracted and profanity-laced conversation among the three was spent attempting to determine who was talking to law enforcement and how the government knew so much about their operations. Throughout the conversation, Strode repeatedly reassured the others that he was not the source of the snitching.

Unbeknownst to Strode, snitches lay on every side. Both Conway and Askew had met with federal agents prior to meeting at Glover's. The agents had outfitted Conway with a recording device, and, as a consequence, the entire conversation at Glover's was recorded. Caught violating the no-contact order, Strode had his pretrial release revoked and was detained through trial. The jury found him guilty on two marijuana conspiracy counts, one count of manufacturing marijuana, and two counts of

money laundering. The jury did acquit Strode, however, of the 18 U.S.C. § 924(e) violation alleged in count five of the indictment, which concerned a firearm found at the house in Indianapolis where Strode had been growing marijuana.

At sentencing, the district court determined that Strode's offense conduct involved between 3,000 and 10,000 kilograms of marijuana and therefore set his base offense level at 34 under U.S.S.G. § 2D1.1(c)(3). Next, the district court gave Strode a two-level enhancement for possession of a dangerous weapon under U.S.S.G. § 2D1.1(b)(1). The district court also added a one-level enhancement under U.S.S.G. § 3C1.1 for obstruction of justice based on the November 2006 meeting at Glover's. After a four-level enhancement for Strode's leadership role, the district court arrived at a total offense level of 41, translating into an advisory guidelines range of 324 to 405 months. Believing that it could not "justify a sentence within the guidelines given what everybody else has gotten," the district court applied the 18 U.S.C. § 3553(a) factors to reduce Strode's guidelines range five levels to 188 to 235 months. It then sentenced Strode to a total term of 192 months' imprisonment. Strode appeals that sentence.

## II.

On appeal, Strode claims the district court erred in fashioning his sentence in three respects, one involving the determination of the quantity of marijuana used to calculate his base offense level and the other two dealing with the enhancements he received for obstruction of justice

and possession of a firearm. We can quickly dispatch of Strode's challenge to the district court's drug calculation, which we review under the deferential clear error standard. *United States v. Seymour*, 519 F.3d 700, 710 (7th Cir. 2008). The district court determined that the amount of marijuana for which Strode was responsible was between 3,000 and 10,000 kilograms and therefore set Strode's base offense level at 34. *See* U.S.S.G. § 2D1.1(c)(3). Strode argues on appeal that the district court should have found only 1,000 to 3,000 kilograms of marijuana, corresponding to a base offense level of 32. *See id*. § 2D1.1(c)(4). According to Strode, the district court's calculation improperly relied on Conway's estimate that 20,000 to 30,000 pounds (or approximately 9,000 to 13,600 kilograms) of marijuana were involved in Strode's drug trafficking conspiracy.

The problem with Strode's argument is that during the sentencing hearing his attorney offered an alternative drug calculation not involving Conway's 20,000-to-30,000-pound estimate, *yet still* came up with a total of 8,000 pounds—or approximately 3,628 kilograms—of marijuana involved in the conspiracy. The Guidelines require the district court to make a "reasonable estimate" of the drug quantity, *United States v. Acosta*, 534 F.3d 574, 582 (7th Cir. 2008); Strode conceded in the district court that a quantity of marijuana around 3,600 kilograms was just that.[1] Said Strode's attorney at the sentencing hearing:

---

[1] The PSR recommended, and the government contended at sentencing, that Strode's offenses involved over 10,000 kilo-

(continued...)

So when we look at the objective records, Your Honor, not that we'd rely on one person's memory or another person's memory, assuming that every trip, one-way trip from Phoenix to Indianapolis was marijuana, and assuming every round trip was marijuana, it seems to me, Your Honor, that we were dealing with approximately 40 to 45 trips.

If we assume that each one of those trips is 200 pounds, that's approximately—40 times 200 is . . . 8,000 pounds. . . . So everything she has said about the volume of this is consistent with what we believe the most accurate amount of pounds is. And so we believe at a minimum, it's a guideline level that the most that's supported by the evidence would be a guideline level 34, if not the guideline level 32.[2]

Strode's attorney concluded: "And so 3,000 kilos is 6,000-some pounds, and so we think that is a pretty good estimate. And we think that that's what is supported by the evidence."

Not surprisingly, Strode now presents to this court a different estimate—2,800 kilograms. That estimate is based

---

[1] (...continued) grams of marijuana and therefore merited an offense level of 36. *See* U.S.S.G. § 2D1.1(c)(2).

[2] At the sentencing hearing, Strode offered no method of calculating the marijuana quantity that would have resulted in a figure between 1,000 and 3,000 pounds and warranted a level 32. Instead, Strode argued that he deserved a level 32 simply because that was the level that "everybody in this case who pled guilty to the marijuana conspiracy" received.

on 31 trips from Arizona over a 90-week span, with each trip involving 200 pounds of marijuana. But Strode gives no explanation of why this new estimate is more accurate than the one he presented as "the most accurate amount" to the district court. Much less does Strode now argue that his previous estimate is not "supported by the evidence"—as he claimed it was—and that the district court thus erred by relying on it.

In any event, Strode's new estimate is inconsistent with the trial testimony. Strode assumes that the conspiracy involved only one trip from Arizona with marijuana every 2.9 weeks. Blackwell testified, however, that he was escorting marijuana from Phoenix to Indianapolis once a week beginning in March 2003, and two to three times a week starting in August 2003. Thus, we reject Strode's new estimate and hold that the district court did not commit clear error by relying on the conservative estimate of the drug quantity provided by Strode's own counsel.

Next, Strode argues that the district court should not have enhanced his sentence one level under U.S.S.G. § 3C1.1 for obstruction of justice.[3] Section 3C1.1 provides a two-level enhancement for a defendant who "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing" of the offense

---

[3] The government does not cross-appeal the district court's decision to give a one-level enhancement for obstruction of justice instead of a two-level enhancement as provided under U.S.S.G. § 3C1.1.

of conviction. The commentary to § 3C1.1 lists as an example of obstructive conduct "threatening, intimidating, or otherwise unlawfully influencing a co-defendant . . . directly or indirectly, or attempting to do so." U.S.S.G. § 3C1.1 application note 4(a) (2007). The district court found that Strode attempted to influence the testimony and defenses of his co-defendants during their conversation at Glover's, which violated the court's no-contact order, and that the attempt constituted obstruction of justice under § 3C1.1. As the district court put it, "So was there intimidation? Probably not. Were there threats? No, there didn't need to be. But there sure was an orchestration to get everybody on the same page."

Although Strode claims that his conversation with Askew and Conway did not constitute obstruction under § 3C1.1 as a matter of law, Strode does not contest that attempting to influence one's co-defendants to "stay strong" and refrain from cooperating with the government in the face of a federal indictment meets the definition of "obstruction of justice" contained in § 3C1.1 and the commentary to that section. *Cf. United States v. Wright*, 37 F.3d 358, 362 (7th Cir. 1994) (finding telephone call to co-defendant obstructive where the gist of the message informed the co-defendant that "if you testify against me, I will testify against you"); *United States v. Robinson*, 14 F.3d 1200, 1203-04 (7th Cir. 1994) (finding phone conversation obstructive where defendant attempted to influence his co-defendant not to testify for the government). Rather, Strode challenges the district court's factual finding that Strode had such a purpose in mind during the meeting at Glover's. Strode claims that the district court misconstrued

the conversation between Conway, Askew, and himself. According to Strode, he was not attempting to encourage his co-defendants to stay strong and prevent them from cooperating with the government. He characterizes the meeting as a "mere attempt to discover who is or might be cooperating."

We review a district court's factual findings supporting a § 3C1.1 enhancement for clear error. *United States v. Dale*, 498 F.3d 604, 608 (7th Cir. 2007). In the context of the recorded conversation at Glover's, we do not find the district court's interpretation of what was said to be clearly erroneous. Admittedly, the transcript of the conversation, as the district court noted, is "not entirely straightforward." However, Strode spends a great deal of effort throughout the conversation attempting to convince Askew and Conway that he "ain't said nothin'" and was not cooperating with the government. The district court reasonably concluded that those assurances were meant to strengthen Askew's and Conway's resolve and prevent them from cooperating with the government by conveying that Strode was in this with them. Though Strode never explicitly stated that he did not want Askew and Conway to cooperate with the government, indirectly implying a need for everyone to keep quiet is not a barrier to an obstruction enhancement. *See United States v. Cherif*, 943 F.2d 692, 703 (7th Cir. 1991) (finding that a letter to a co-conspirator advising her that she did "not know anything" about their fraudulent scheme was a "subtle and somewhat clever attempt to tell her, 'Don't spill the beans'" and justified a § 3C1.1 enhancement).

Moreover, the context of the conversation clearly reveals an obstructive intent. *See Wright*, 37 F.3d at 362 (noting that allegedly obstructive statement must be "view[ed] in context"). Strode told Conway that the purpose for the meeting was so that they could get their stories straight. Moreover, Strode knew the consequences if the court caught him meeting with his co-defendants—immediate imprisonment. That Strode knew the stakes yet chose to meet with his co-defendants anyway strongly suggests that Strode did not want to see Conway and Askew simply to shoot the breeze or catch up on old times. Rather, it suggests a specific business purpose: to see if he could persuade his co-defendants not to cooperate with the government by demonstrating his own loyalty to them. Although his plan did not work as intended because Askew and Conway had already turned on him, an unsuccessful attempt suffices under § 3C1.1. *See United States v. Fuller*, 532 F.3d 656, 666 (7th Cir. 2008). The enhancement was therefore properly applied.

Lastly, Strode argues that his sentence should not have been enhanced two levels under U.S.S.G. § 2D1.1(b)(1) for possession of a firearm. We again apply the clear error standard of review to assess the accuracy of the district court's application of that enhancement. *United States v. Idowu*, 520 F.3d 790, 793 (7th Cir. 2008). Section 2D1.1(b)(1) provides: "If a dangerous weapon (including a firearm) was possessed, increase by 2 levels." We have defined "possession" to include firearms possessed by coconspirators in furtherance of the conspiracy that the defendant could have reasonably foreseen. *Acosta*, 534

F.3d at 588. "Once the government has proved possession, the defendant must show it is clearly improbable that the weapon was connected with the offense." *Id*.

The district court did not commit clear error by applying § 2D1.1(b)(1). Indeed, it had its pick of firearms from which to choose, any one of which was sufficient to assess the enhancement. There was a firearm that Blackwell testified he saw in Strode's BMW; a firearm that both Conway and Ironn Anderson, another Strode associate, testified they saw in Strode's waistband; two firearms law enforcement officers observed in vehicles driven by Strode during traffic stops on two separate occasions; three more firearms law enforcement officers recovered from homes used by Strode in his drug distribution operation (not including the loaded weapon officers found at Strode's grow house that was the subject of count five of the indictment); a firearm found during a search of Strode's residence; and a firearm that Askew, Conway, and Blackwell testified Blackwell pointed at Conway in response to Strode's order to prevent Conway from leaving Blackwell's garage until Strode arrived to settle a dispute over the proper distribution of some of the marijuana.

Other than the two firearms found in one of the residences, Strode makes no claim that the evidence was insufficient to support an enhancement on the basis of his possession of those weapons. Nor does Strode argue that those firearms were unconnected to his drug operations or that he could not have foreseen them. Instead, Strode contends that those instances of firearms possession

suffer from a "credibility problem." According to Strode, the jury's acquittal of him on the charge of possessing the firearm in the grow house in furtherance of the marijuana-growing operation shows that the jury found the other instances of gun possession lacking in "credibility and probative value."

That argument has no merit. We do not see how Strode's acquittal on that charge sheds any light on what the jury thought of the other, uncharged acts of gun possession that came out during the course of trial. Moreover, the different standards of proof between trial and sentencing make the jury's determination irrelevant to the application of the § 2D1.1(b)(1) enhancement. Despite the acquittal, although not necessary in this case, the district court could have permissibly enhanced Strode's sentence under § 2D1.1(b)(1) for the weapon that was involved in the acquitted charge if it found that the enhancement was supported by a preponderance of the evidence. *See United States v. Watts*, 519 U.S. 148, 149 (1997); *United States v. Price*, 418 F.3d 771, 788 (7th Cir. 2005). If even the acquitted conduct was fair game, then the district court certainly was not prevented from applying the enhancement based on any of the uncharged instances of firearm possession proved by a preponderance of the evidence at sentencing.

### III.

The district court committed no error in sentencing Strode. The district court's drug quantity calculation, which comported with what Strode's attorney advanced

as reasonable in the district court, was not clearly errone-ous. The district court properly enhanced Strode's sentence one level for obstruction of justice based on Strode's conversation with his co-defendants in violation of the court's no-contact order. And the district court properly enhanced Strode's sentence two levels based on the numerous instances of firearm possession by Strode in the record. We therefore AFFIRM Strode's conviction and sentence.