In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-2287

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHARLES A. EVANS,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 14-CR-00108 — **James D. Peterson**, *Judge*.

ARGUED APRIL 27, 2016 — DECIDED JUNE 20, 2016

Before FLAUM, MANION, and WILLIAMS, *Circuit Judges*.

MANION, *Circuit Judge*. Charles Evans pleaded guilty to distributing heroin, *see* 21 U.S.C. § 841(a)(1), and was sentenced below the guidelines range to 144 months' imprisonment. He challenges his sentence, arguing that he should not have received a two-level upward adjustment which applies if a drug offender "maintained a premises for the purpose of manufacturing or distributing a controlled substance," U.S.S.G. § 2D1.1(b)(12), and denying a two-level reduction for

acceptance of responsibility, *id.* § 3E1.1. We affirm the judgment.

## I. Background

From May to September 2014, Evans sold heroin in Beloit, Wisconsin, often from the apartment of his coconspirator, Tiana Williams. Informants made four controlled buys from Evans in July 2014: .43 grams for $100, .205 grams for $100, 1.97 grams for $180, and 1.983 grams for $180. Two of those transactions occurred at Williams's apartment.

One steady customer of Evans and Williams was J.J., who purchased heroin once, sometimes twice, daily from May through August 2014, for a rough total of 113 grams. Most of those buys occurred at Williams's apartment. By late August 2014, J.J. owed Evans $3,500 for heroin, plus more money for a car he had bought from Evans. When J.J. didn't pay, Evans beat him and broke his jaw. Although J.J. borrowed money and paid Evans, he still was afraid, which prompted him to tell his own probation officer about the debt and beating.

J.J.'s report to his probation officer apparently led Beloit police officers to detain Evans on a "probation hold" on September 9, 2014. While in jail, Evans used a monitored jail telephone to call Williams. Williams told him that, based on what she had learned from his probation officer, she thought he was in jail because someone had accused him of selling drugs and committing a battery. Evans instructed Williams to call "Smiley," a frequent customer, and tell him to find the "dude fixing on the car." Smiley understood this to mean J.J., so on September 19, he and Williams drove to J.J.'s house intending to pressure him to change his story. But J.J. wasn't home (he was hiding in a car nearby), so the pair returned the next day

and told J.J.'s mother that he had to change his story. Williams later talked to Evans again on a monitored jail telephone and reported that she had delivered the message to J.J.'s mother that he must change his story.

J.J. told investigators about these visits and said that he felt threatened and fearful for himself and his family. The investigators confronted Williams, who at that point denied having gone to J.J.'s house. Then in a third monitored call the next day, Williams told Evans that she had lied to the investigators by denying having gone to J.J.'s house and saying that she did not know Smiley.

By then federal authorities had been investigating Evans and Williams for several months. One customer told investigators that Evans had sold heroin in 7-gram increments to her and her boyfriend on 10 to 15 occasions, often at Williams's apartment. Another customer said that he had seen Evans with a softball-sized chunk of heroin, and that he had purchased heroin on 20 occasions from Evans and Williams. And Smiley, after deciding to cooperate, told investigators that he estimated that on 50 occasions he had bought heroin from Evans, the "biggest heroin dealer" he knew. Smiley added that Williams had been present on 10 to 20 of those occasions. He also confessed that he had gone to J.J.'s with Williams. Smiley's girlfriend admitted that she had bought heroin about 50 times from Williams—and sometimes Evans—usually at Williams's apartment.

Federal authorities indicted Evans and Williams on October 29, 2014, and arrested them the next day. At first Evans denied selling heroin or breaking J.J.'s jaw. But Williams accompanied investigators to her apartment and showed them empty packaging from drugs, the scale Evans had used to

measure heroin, and the hiding places where they had stored heroin.

As part of his plea agreement, Evans acknowledged that the drug quantity was between 100 and 400 grams of heroin, which yielded a base offense level of 24. At sentencing, over objection, the district court added two levels under U.S.S.G. § 2D1.1(b)(12) for maintaining a premises, i.e., Williams's apartment, to distribute drugs. Defense counsel had argued that § 2D1.1(b)(12) should not apply because Evans did not operate a *large* stash house or even rent or control Williams's apartment. The court pointed out that Evans had sent customers to the apartment and sold heroin from there.

The district court applied another two-level upward adjustment for obstruction of justice, *see* U.S.S.G. § 3C1.1, reasoning that Evans had directed Williams to pressure J.J. to retract his accusation about the drug debt and related beating.[1] Defense counsel argued that Evans nonetheless deserved a two-level downward adjustment for accepting responsibility because he had pleaded guilty and cooperated with prosecutors after he was indicted. The government countered that Evans had not shown acceptance of responsibility when he instructed Williams to induce J.J., a victim, to recant his statement. The court agreed with the government and found that Evans's attempts were "really inconsistent with the kind of full acceptance of responsibility that would make it appropriate to give him a two-level downward adjustment." The court

---

[1] Williams pleaded guilty to conspiring to intimidate a witness, *see* 18 U.S.C. §§ 371, 1512(b). She filed an appeal from her conviction and sentence, which we have addressed separately. *See United States v. Williams*, No. 15-2288 (7th Cir. June __, 2016).

added that this wasn't an "extraordinary case" warranting both an upward adjustment for obstruction and a downward adjustment for acceptance of responsibility.

The district court calculated an imprisonment range of 168 to 210 months based on a total offense level of 30 and a criminal-history category of VI. After considering the factors in 18 U.S.C. § 3553(a), the court sentenced Evans to 144 months.

## II. Analysis

On appeal Evans challenges the increase he received under U.S.S.G. § 2D1.1(b)(12) for maintaining a premises to distribute drugs. Section 2D1 provides for a two-level increase "[i]f the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance," U.S.S.G. § 2D1.1(b)(12), including by using a "building, room, or enclosure" to store drugs, *id.* § 2D1.1 cmt n.17. In assessing whether this increase applies, sentencing courts should consider "(A) whether the defendant held a possessory interest in the premises (e.g., owned or rented), and (B) the extent to which the defendant controlled access to, or activities at, the premises." *Id.* Evans asserts that he did not have a possessory interest in Williams's apartment since his name was not on the lease, he did not live in the apartment or even have a key, and he did not keep anything (other than drugs) at the apartment. The government concedes that Evans did not have "actual possession" of the apartment but insists that he did control access to and activities at the apartment and thus exercised "constructive possession."

Whether or not Evans had a "possessory interest" in Williams's apartment, he did control the access and activities there. A defendant "'maintains' a drug house if he … exercises

control over [the premises], and for a sustained period of time, uses those premises to manufacture, store, or sell drugs, or directs others to those premises to obtain drugs." *United States v. Acosta*, 534 F.3d 574, 591 (7th Cir. 2008). The district court had ample evidence that Evans controlled activities at Williams's apartment and even controlled Williams herself: He packaged drugs at the apartment, he directed customers to go there to buy drugs, he ordered Williams to retrieve drugs from hiding places in the apartment where he stored the drugs, he told Williams how to dispense heroin to customers when he was not present, and he dealt drugs in the apartment on at least 50 occasions (and likely significantly more) during just a few months. These circumstances support the application of § 2D1.1(b)(12).

That drugs were stashed in the apartment shows "storage of a controlled substance for the purpose of distribution." U.S.S.G. § 2D1.1 cmt. n.17; *see, e.g., United States v. Jones*, 778 F.3d 375, 385 (1st Cir. 2015) (upholding application of § 2D1.1(b)(12) and agreeing with district court that evidence of drug sales over three-month period and discovery of digital scale, boxes of baking soda, plastic baggies, and packaging with cocaine residue established nexus between apartment and defendant's drug trafficking). Moreover, "tools of the trade"—such as the baggies and scale found at Williams's apartment—can be "indicia that drug trafficking was the principal use of the premises." *United States v. Flores-Olague*, 717 F.3d 526, 533 (7th Cir. 2013) (citing *United States v. Miller*, 698 F.3d 699, 706–07 (8th Cir. 2012)); *see also United States v. Sanchez*, 810 F.3d 494, 496–97 (7th Cir. 2016).

Evans suggests that he could not have controlled the activities at the apartment because its "primary" use was as a

"family dwelling place" for Williams and her son. But the commentary to § 2D1.1 specifically directs sentencing courts to consider the *defendant*'s "primary or principal uses for the premises" and how often the *defendant* used the premises for drug trafficking rather than lawful purposes. U.S.S.G. § 2D1.1 cmt. n.17. The district court properly focused on the fact that Evans's use of the apartment included sending customers there, selling drugs from the location, and instructing Williams to make sales from the apartment in his absence. *See Miller*, 698 F.3d at 706 (upholding application of § 2D1.1(b)(12) to codefendant who had actively participated in three drug sales at the property and also accepted payment there for other drug sales).

Moreover, Williams's use of the apartment as a residence is not dispositive because drug activity need not be the exclusive use of the premises for the upward adjustment to apply. "[A] premise can have more than one primary use (drug distribution and residence), and, as long as it is more than 'incidental or collateral,' drug distribution does not have to be the 'sole purpose.'" *Sanchez*, 810 F.3d at 497 (quoting U.S.S.G. § 2D1.1 cmt. n.17); *see United States v. Bell*, 766 F.3d 634, 638 (6th Cir. 2014); *United States v. Johnson*, 737 F.3d 444, 447 (6th Cir. 2013) (upholding application of § 2D1.1(b)(12) to defendant who used one room of his home to store drugs for distribution); *Miller*, 698 F.3d at 706–07.

Evans's disagreement with the application of § 2D1.1(b)(12) thus lacks merit. Also without merit is his further claim that he deserved a downward adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1 even though he received an upward adjustment for obstruction of justice under U.S.S.G. § 3C1.1. Evans does not contest the increase for

obstruction, but he argues that his case is "extraordinary," *see* U.S.S.G. § 3E1.1 cmt. n.4, because he admitted the scope of his conduct, pleaded guilty, and obstructed justice only "on a single occasion before being indicted."

"When a sentencing court properly enhances a defendant's offense level under § 3C1.1 for obstructing justice, 'he is presumed not to have accepted responsibility.'" *United States v. Ewing*, 129 F.3d 430, 435 (7th Cir. 1997) (quoting *United States v. Larsen*, 909 F.2d 1047, 1050 (7th Cir. 1990)). In "extraordinary cases," a defendant may initially obstruct justice and later accept responsibility. U.S.S.G. § 3E1.1 cmt. n.4; *United States v. Galbraith*, 200 F.3d 1006, 1016 (7th Cir. 2000). Evans compares himself to the defendant in *United States v. Lallemand*, who cooperated with the police by retracting his instruction to an accomplice to destroy evidence. 989 F.2d 936, 937–39 (7th Cir. 1993), *abrogated in unrelated part by United States v. Vizcarra*, 668 F.3d 516, 523–25 (7th Cir. 2012). But the analogy is unsound because the defendant in *Lallemand* tried to terminate the planned obstruction immediately after he was arrested, whereas Evans embarked on a course of obstructive conduct after—and because—he had been detained on a probation hold.

Evans pleaded guilty after trying unsuccessfully to obstruct justice, but pleading guilty does not assure a reduction for acceptance of responsibility. *United States v. Bennett*, 708 F.3d 879, 893 (7th Cir. 2013); *see United States v. Davis*, 442 F.3d 1003, 1010 (7th Cir. 2006) (upholding denial of reduction for defendant who pleaded guilty but presented no evidence that she negated effect of her obstruction). The district court was justified in concluding that this wasn't an "extraordinary

case" and deciding not to credit Evans for acceptance of responsibility. Acceptance of responsibility is a question of fact reviewed for clear error, *United States v. Krasinski*, 545 F.3d 546, 554 (7th Cir. 2008), and the finding in this case is not clearly erroneous.

Accordingly, the judgment is AFFIRMED.