In the

# United States Court of Appeals

## For the Seventh Circuit

No. 21-1398

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MARCUS J. FORD,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:20-cr-30052-NJR-1 — **Nancy J. Rosenstengel**, *Chief Judge.*

ARGUED OCTOBER 28, 2021 — DECIDED JANUARY 6, 2022

Before RIPPLE, HAMILTON, and SCUDDER, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Marcus Ford pled guilty to distributing and possessing methamphetamine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). The district court sentenced him to concurrent terms of 168 months on each count. On appeal, Ford challenges the district court's application of Sentencing Guidelines enhancements for possessing a dangerous weapon under U.S.S.G. § 2D1.1(b)(1) and maintaining a drug premises under

§ 2D1.1(b)(12). He argues that the facts did not establish either that he constructively possessed the handgun in question or that he exercised sufficient control over the bedroom where agents found the handgun and drugs. We affirm. The district court did not clearly err in finding facts that were sufficient to apply both sentencing enhancements.

I.   *Factual Background*

A person who had known Ford for ten years and had been buying drugs from him for approximately six years notified federal agents that Ford was selling drugs out of the home of one Marshonda Nicholson. The source explained that he/she often bought drugs from Ford at Nicholson's home. If Ford did not answer the phone when the source called to set up a drug sale, he/she would often just stop by the home and ask if Ford was there. Also, the source mentioned that Ford had a safe in the rear bedroom where he kept his drugs and cash. At the direction of agents, the source made a controlled purchase of drugs from Ford.

Based on the source's tip and the controlled purchase, agents obtained a search warrant for Nicholson's home. They found Nicholson, her partner, and four children in the home, but Ford was not there. In the rear bedroom, the agents discovered a fire safe. Inside the safe were $3,007 in cash, 101 grams of marijuana, and 843 grams of methamphetamine. Agents also found a handgun in the closet of that bedroom. In addition to the contraband, agents found in the rear bedroom two identification cards, several pieces of mail, and prescription drug bottles, all belonging to Ford, as well as photographs depicting him.

During the search, agents interviewed Nicholson and her partner. Nicholson told agents that she rented the home and that "everyone" had access to it, including her brothers. She later admitted that Ford also had access. She mentioned that Ford had been staying with her for about four months and that he was often "in and out." Nicholson explained that Ford mainly used and stayed in the rear bedroom, but there was some evidence that her brother also stayed there occasionally. She also confirmed that Ford had been at the house the day before agents executed the search warrant.

Nicholson's partner suggested that both Nicholson's brother and Ford likely used the home as a "dope house." In her own statement, Nicholson conceded that Ford sold drugs from the house, that people would come asking for "such and such," and that she would let them in. She also said that the drugs in the rear bedroom belonged to Ford. Nicholson said she did not "mess with" the rear bedroom and did not know who owned the handgun that agents found in the closet.

II. *District Court Proceedings*

A federal grand jury indicted Ford on two counts: distributing methamphetamine and possessing methamphetamine with intent to distribute it. Ford pled guilty, stipulating that he distributed 79.9 grams of methamphetamine to a confidential source at Nicholson's home and that he possessed the 843 grams of methamphetamine, along with the $3,007 in cash, in the safe in the rear bedroom.

The Presentence Report prepared by the United States Probation Office recommended that the district court include in its Sentencing Guideline calculation two enhancements to Ford's offense level: (1) two offense levels under U.S.S.G.

§ 2D1.1(b)(1) for possessing a dangerous weapon in connection with the drug distribution because Ford possessed the firearm that was found close to the drugs in the rear bedroom, and (2) two offense levels under § 2D1.1(b)(12) for maintaining a drug premises because Ford used at least a portion of Nicholson's home for the purpose of storing and distributing methamphetamine. Ford objected to those enhancements. The district court overruled his objections, finding that the evidence supported both enhancements.

With those enhancements, the district court found that Ford's total offense level was 35 and that he was in criminal history category III, yielding an advisory guideline range of 210–262 months in prison. The court ultimately sentenced Ford to 168 months, below the guideline range. The court did not indicate, however, that it would have imposed the same sentence even without the two guideline enhancements. In light of the discussion that follows, we take this opportunity to encourage district courts, again, to consider stating clearly whether disputed guideline issues actually affected the ultimate sentence. See, e.g., *United States v. Colon*, 919 F.3d 510, 519–20 (7th Cir. 2019) (guideline error deemed harmless based on judge's explanation of sentence); see also *United States v. Williams*, 949 F.3d 1056, 1068–70 (7th Cir. 2020) (same); *United States v. Salgado*, 917 F.3d 966, 969–70 (7th Cir. 2019) (same); *United States v. Thomas*, 897 F.3d 807, 817–18 (7th Cir. 2018) (same).

III. *Analysis*

Because Ford objected to both sentencing enhancements in the district court, we review the district court's fact-finding on guideline issues for clear error and its legal interpretation of the Sentencing Guidelines de novo. *United States v. Fluker*, 698

F.3d 988, 1001 (7th Cir. 2012). The clearly-erroneous standard is deferential. We will not disturb the district court's findings of fact unless, after examining the evidence, we are "left with the definite and firm conviction that a mistake has been made." *Id.*, quoting *United States v. Rice*, 673 F.3d 537, 540 (7th Cir. 2012).

A. *Possession of a Dangerous Weapon*

The Sentencing Guidelines advise adding two offense levels in drug cases "if a dangerous weapon (including a firearm) was possessed." § 2D1.1(b)(1). The commentary for this provision explains: "The enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." § 2D1.1 cmt. n.11(A). Before a court can apply the enhancement, the government must establish by a preponderance of the evidence that the defendant possessed the weapon, either actually or constructively. *United States v. Thurman*, 889 F.3d 356, 372 (7th Cir. 2018). If the government proves possession, then the burden shifts to the defendant to show that it was clearly improbable that he possessed the weapon in connection with the drug offense. *Id.*

Here, the government relied on a theory of constructive possession, which requires proof of a nexus between the defendant and the contraband. *United States v. Morris*, 576 F.3d 661, 666 (7th Cir. 2009). "Proximity to the item, presence on the property where the item is located, or association with a person in actual possession of the item" alone is not sufficient to prove constructive possession. *Id.*, citing *United States v. Windom*, 19 F.3d 1190, 1200 (7th Cir. 1994). Instead, the government must establish that "the defendant knowingly had the power and intention to exercise dominion and control

over the object." *United States v. Katz*, 582 F.3d 749, 752 (7th Cir. 2009). That power and intention can be established by circumstantial evidence. *Morris*, 576 F.3d at 666.

The government can demonstrate the required nexus in one of two ways. First, if the government shows that the defendant had exclusive control of the property where officers discovered the contraband, the court can infer that the defendant constructively possessed the contraband. *Morris*, 576 F.3d at 667. Second, if the defendant did not have exclusive control over the property, constructive possession can be proven by evidence "that a defendant had a 'substantial connection' to the location where contraband was seized," *id.*, quoting *United States v. Richardson*, 208 F.3d 626, 632 (7th Cir. 2000), but that path also requires the government to show that the defendant had a substantial connection to the contraband itself, not just that he jointly occupied a residence where the contraband was found. *United States v. Griffin*, 684 F.3d 691, 697 (7th Cir. 2012).

On appeal, Ford first argues that the district court made a legal error by lowering the government's burden of proof. The judge said: "by a preponderance of the evidence it has been established that the weapon was present and that it is not clearly improbable that Mr. Ford possessed the firearm in connection with drug distribution." Ford contends that comment shows that the court erred by collapsing two distinct issues, possession of the firearm and connection to the drug offenses. In particular, he argues that the court erred by lowering the government's burden, requiring it to establish only that it was not clearly improbable that he possessed the gun rather than requiring it to prove possession by a preponderance of the evidence.

Taken in isolation, the district court's quoted comments on the point were not as crisp as they could have been, but the transcript as a whole persuades us that the district court found constructive possession had been shown by a preponderance of the evidence. After reaching that conclusion early on, the court focused its analysis on the second, distinct issue, whether Ford's possession was sufficiently tied to the drug offenses. We find no legal error in the court's approach to the constructive possession issue.

Ford also asserts that even if the court held the government to the proper burden of proof, the evidence simply did not support a finding of constructive possession of the firearm. He admits that the evidence established that he used the rear bedroom to store his drugs, cash, and other personal items. He contends, however, that the distance between the handgun in the closet and his personal property on the bedroom floor does not support an inference that he had a connection to or exercised control over the weapon. Ford points to evidence that he believes undercuts that inference, including that the source did not mention ever having seen him with a gun, despite purchasing drugs from him for years, and evidence that the rear bedroom was accessible to others.

Constructive possession can be joint or sole. See *United States v. Kitchen*, 57 F.3d 516, 519–21 (7th Cir. 1995) (ability of other adults to exercise control over firearm and presence of their belongings in bedroom did not undermine inference that defendant constructively possessed firearm). In cases of joint constructive possession, the focus is on whether the government can establish a substantial connection between the defendant and the contraband. E.g., *United States v. Alanis*, 265 F.3d 576, 592 (7th Cir. 2001) (affirming jury finding that

defendant possessed gun found in a nightstand near his bed, clothing, eyeglasses, and wallet); see also *Richardson*, 208 F.3d at 632 (affirming district court finding that defendant possessed both drugs and firearm; his medicine bottles and clothes were in bedroom where officers recovered firearm, he received mail at the address, and defendant either resided at or was caretaker of property).

*Alanis* and *Richardson* both affirmed findings of possession beyond a reasonable doubt. They indicate that the district court here did not clearly err in finding by a preponderance of the evidence that Ford had a substantial connection to the handgun. The district court heard evidence that Ford used the rear bedroom where agents found the handgun to store his drugs and drug proceeds, including a safe with 843 grams of methamphetamine and $3,007 in cash, possession of which Ford admitted. His identification cards, mail, prescription bottles, and the photographs were close to the small bedroom's closet where agents found the handgun. Nicholson confirmed that, even though others had access to the room and may have kept belongings there, Ford was the main user of the rear bedroom.

Ford suggests that the court's finding that he possessed the handgun is undermined by evidence that the source, who had known him for ten years, did not report having seen Ford with a gun. That evidence weighs in favor of Ford but falls well short of showing a clear error given the close proximity of the gun to Ford's drugs and cash in the room where he conducted drug transactions.

As in many guideline cases, the facts here allowed room for argument. On this record, we would not reverse a finding that possession had not been shown, but the district court did

not clearly err in finding by a preponderance of the evidence that Ford possessed the handgun in the closet in connection with his drug sales and applying the guideline enhancement.

B. *Maintaining a Drug Premises*

The Sentencing Guidelines advise adding two offense levels if the defendant "maintained a premises for the purpose of manufacturing or distributing a controlled substance." U.S.S.G. § 2D1.1(b)(12). The Guidelines define premises to include "a building, room, or enclosure," so Ford's control over just the rear bedroom could support the enhancement. § 2D1.1 cmt. n.17.

A defendant maintains a drug premises "if he owns or rents [the] premises, or exercises control over them, and for a sustained period of time, uses those premises to manufacture, store, or sell drugs, or directs others to those premises to obtain drugs." *United States v. Acosta*, 534 F.3d 574, 591 (7th Cir. 2008). The defendant does not necessarily need to have owned or rented the premises, but to exercise the requisite control, he must have been more than a casual visitor. *Id.* A defendant can maintain the premises even if he does not exercise control to the exclusion of all others. *United States v. Sanchez*, 810 F.3d 494, 497 (7th Cir. 2016).

Ford argues that he did not exercise control over the activities conducted in the rear bedroom to a sufficient degree. He asserts that our cases affirming findings that a defendant maintained a drug premises often involve defendants who did more than keep drugs and conduct an unknown number of sales on the premises. In addition, Ford notes that extra facts that established control in other cases are missing here.

As the district court noted, Ford did not have a possessory interest in Nicholson's home or the rear bedroom. Nicholson rented the home. Ford did not pay her to stay in or use the rear bedroom. That lack of a legal possessory interest is not necessarily decisive. A defendant who does not have a possessory interest can exercise control over a premises as a matter of fact when he actually conducts his drug enterprise from the location. See *United States v. Evans*, 826 F.3d 934, 938 (7th Cir. 2016) (affirming finding that defendant controlled access and activities at apartment when he stored and packaged his drugs there, told customers to go there to buy drugs, and directed owner where to find hidden drugs and how to sell drugs to customers when he was not present); see also *Acosta*, 534 F.3d at 591–92 (affirming jury finding that defendant maintained home as a drug premises even though owner exercised ultimate control; defendant stayed at home on and off rent-free for seven months, cooked, packaged, and sold drugs to customers who came to house, and directed owner's daughter to sell drugs).

The facts here are not identical to *Evans* and *Acosta*, but we have cautioned that other courts' reliance on certain facts as justifying this enhancement "does not mean that those facts *necessarily* must be shown in every case." *Sanchez*, 810 F.3d at 497, quoting *United States v. Johnson*, 737 F.3d 444, 448 (6th Cir. 2013). Whether or not Ford directed Nicholson to sell drugs for him, the evidence supported the district court's finding that Ford exercised sufficient control over the rear bedroom to have maintained that room as a drug premises. Ford had been staying with Nicholson for four months. Although Ford did not have exclusive control over the rear bedroom, Nicholson said that Ford was the main user and occupant of it. Ford stored his drugs and drug proceeds in a safe in that room. He

conceded that he sold drugs out of Nicholson's home, and Nicholson mentioned that when people would come to her door asking for "such and such," she would let them in. The source also confirmed that he/she often met Ford at Nicholson's home to buy drugs and that if Ford did not answer his phone ahead of time, the source would just stop by the home and ask for him. The district court did not clearly err in finding that Ford maintained the rear bedroom as a drug premises.

Our decision affirming application of the drug premises enhancement here should not signal district courts that they *must* apply the enhancement in similar cases. Even under the district court's findings of fact, this case falls close to the limits of the "premises" enhancement. It is not hard to find cases where we have affirmed this enhancement with more compelling evidence. For example, in *United States v. Sanchez* we affirmed the district court's application of the enhancement in light of evidence that for two years the defendant had sold and stored as much as forty kilograms of drugs from his home, that drug dealing was his main source of income, and that he was part of a conspiracy responsible for almost $2.5 million in drug trafficking. 710 F.3d 724, 731–32 (7th Cir. 2013), judgment vacated on other grounds, 571 U.S. 801 (2013). Similarly, in *Acosta*, we affirmed the same enhancement based on evidence that the defendant regularly dealt drugs from the home, directed the homeowner's daughter to sell drugs for him when he was not there, and he did not pay rent but gave the homeowner free drugs for her personal use. 534 F.3d at 591–92.

In this case, by contrast, Ford had been using the rear bedroom for only four months, and Nicholson was not shown to have been an active participant in his drug enterprise, limiting

her involvement to letting potential customers in the house when they came asking for "such and such." The evidence here, as in other cases, is thus closer to the outer limits of the enhancement's reach. See, e.g., *United States v. Zamudio*, 18 F.4th 557, 563 (7th Cir. 2021) (defendant hid bundles of drugs throughout his garage for two to three months and kept drug paraphernalia in his car); *United States v. Winfield*, 846 F.3d 241, 243 (7th Cir. 2017) (defendant stored drugs in his garage, sold drugs to an informant four times in the twelve weeks before the police raid, and primarily lived off proceeds from his drug sales).

We recognize that it can be difficult to define the boundaries of the drug premises enhancement. Consistent with the Guideline commentary on § 2D1.1(b)(12), we encourage district courts to focus on how often the defendant used the premises for his drug enterprise, the scope of the enterprise, and the extent to which he controlled access and activities on the premises. Although we do not find that the district court clearly erred here, we also remind district courts that they should not try to stretch these borderline cases at the risk of extending this advisory enhancement beyond its intended realm.

AFFIRMED.