In the

# United States Court of Appeals

## For the Seventh Circuit

No. 23-2760

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CLIFTON COLEMAN,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:20-cr-00340 — **Mary M. Rowland,** *Judge.*

ARGUED OCTOBER 30, 2025 — DECIDED MAY 26, 2026

Before LEE, PRYOR, and KOLAR, *Circuit Judges.*

KOLAR, *Circuit Judge.* Between 2019 and 2020, Defendant
Clifton Coleman participated in a drug trafficking scheme
selling fentanyl-laced heroin in two Chicago drug markets.
His role in the scheme was twofold: he supplied the product
for the operation, and he provided an apartment for his col-
laborators to mix and package the product for sale.

In connection with this scheme, Coleman pled guilty to one count of violating 21 U.S.C. §§ 841 and 846, and was sentenced to a 150-month term of imprisonment. In reaching this sentence, the district court applied two sentencing enhancements. First, the district court determined that Coleman was a leader of the drug scheme, supporting a four-level enhancement under United States Sentencing Guideline ("U.S.S.G.") § 3B1.1(a) ("the leadership enhancement"). Second, the court concluded that Coleman had maintained an apartment on the west side of Chicago ("the South Albany property") for the purpose of distributing drugs, supporting a two-level enhancement under U.S.S.G. § 2D1.1(b)(12) ("the drug premises enhancement").

Coleman now appeals his sentence, asserting that the district court applied the two sentencing enhancements in error. On the leadership enhancement, he argues that the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), by suppressing recordings of statements made by his co-defendants that would have disproved his status as a leader in the drug scheme. On the drug premises enhancement, he argues that the district court's finding was inconsistent with our recent decisions in *United States v. Ford*, 22 F.4th 687 (7th Cir. 2022), *United States v. Montgomery*, 114 F.4th 847 (7th Cir. 2024) (*per curiam*), and *United States v. Craft*, 99 F.4th 407 (7th Cir. 2024).

We disagree on both fronts. The record shows that the government provided Coleman with transcript summaries of the co-defendants' statements that provided the information Coleman sought to undermine his leadership role. Thus, Coleman cannot establish *Brady*'s materiality prong for the purposes of the leadership enhancement. The drug premises enhancement is more difficult: Coleman presents a close case

following our opinions in *Ford*, *Montgomery*, and *Craft*. But the combination of his ownership of the South Albany property, his renting the property with knowledge it would be used as a drug premises, and his level of control over the drug activities taking place there justify the enhancement. We affirm.

## I. Background

### A. The Offense

We present the facts as admitted in Coleman's plea agreement and unchallenged in the Presentence Report ("PSR"). Coleman's involvement in the drug trafficking organization ("DTO") at issue dates back to at least February 2019, the first alleged date of his involvement in supplying products to two open-air drug markets in Chicago. His primary role was to provide heroin to lower-level "managers": Coleman would make weekly deliveries of heroin to three managers—Rodney Rowsey, Bernard Rowsey, and Tarrence Watson—who would then cut, mix, and package the drugs for distribution. Coleman would make these deliveries to the South Albany property, which he personally owned but rented to Watson for roughly $1,000 per month, and where Watson and the Rowseys would mix the product. Once packaged, the managers passed the product along to "distributors" to sell the product at the drug markets, giving a cut to Coleman and the managers. Between February 2019 and July 2020, Coleman supplied, and the DTO sold, at least 25 kilograms of heroin and 40 grams of fentanyl.

In investigating Coleman's involvement in the DTO, law enforcement assembled a vast library of wiretapped conversations between the various DTO members, including those between Watson and the Rowseys. These conversations

revealed that Coleman's involvement was not limited to supplying product: he also had a say in how the DTO sold the product and managed personnel. For instance:

- In an October 8, 2019 text conversation, Watson explained to the Rowseys that Coleman had unilaterally decided to supply weaker heroin to improve volume and sales.
- In an October 20, 2019 call, Watson relayed a warning from Coleman to another DTO member that if he took "[Coleman's] money again … you don't work for him [anymore]."
- In a November 3, 2019 call, Watson explained that Coleman had overruled his decision to "fire" one of the DTO members.
- In a March 18, 2020 conversation, Watson and Bernard Rowsey discussed cutting and mixing the heroin according to what "[Coleman] want[s] … [to] do."

The DTO came to an end in July 2020, when the government charged Coleman, Watson, the Rowseys, and other DTO members with a conspiracy "to knowingly and intentionally possess with intent to distribute and distribute a controlled substance" in violation of §§ 841(a)(1) and 846. Coleman pled guilty to the conspiracy charge in February 2023.

**B. Sentencing**

In the PSR, Probation recommended two offense-based sentencing enhancements. First, it applied the four-level leadership enhancement under U.S.S.G. § 3B1.1(a), relying on the charging documents, Coleman's plea declaration, and the

government's version of the events. In applying this enhancement, Probation also relied on a statement from the FBI case agent relaying that Coleman's co-defendants had, in post-arrest interviews, identified him as the leader of the DTO. Probation also recommended the two-level drug premises enhancement, concluding that Coleman had "owned the [South Albany] property in Chicago where he met with others to cut and package narcotics, and this was not the defendant's primary residence." Applying both enhancements increased Coleman's recommended offense level from 31 to 37. In addition, the leadership enhancement rendered him ineligible for "safety-valve" relief from the statutory minimum and a further two-level reduction. *See* 18 U.S.C. § 3553(f); U.S.S.G. §§ 2D1.1(b)(18), 5C1.2. With both enhancements applied, Probation's recommended guideline range was 210 to 262 months.

Coleman objected to both enhancements. Regarding the leadership enhancement, Coleman presented summaries of the co-defendants' post-arrest interviews—in the form of FBI "302" forms provided by the government—which contradicted the FBI case agent's statement that all of his co-defendants had identified him as the DTO's leader. Indeed, the FBI 302s revealed that some co-defendants had denied Coleman's leadership status or made no statement regarding his role in the DTO. While observing that it was "somewhat unusual" that the government had not provided actual recordings of the post-arrest interviews in addition to FBI 302s, Coleman's counsel did not request access to these recordings or argue that they had been suppressed.

As to the drug premises enhancement, Coleman conceded that he owned the property and had rented it to Watson. But he asserted that Watson maintained total control of the

property, and that his infrequent visits to the South Albany property were to—as a landlord—perform maintenance or deal with his other tenant. He denied ever participating in the mixing or packaging of drugs at the property.

The district court adopted Probation's recommendation and applied both enhancements, acknowledging both as close questions. As to the leadership enhancement—though the government conceded that the FBI's summary of the co-defendants' statements was inaccurate—the court relied on the wiretapped statements from Watson and the Rowseys, showing that they "felt … they were working for [Coleman]." On the drug premises enhancement, the court concluded that given Coleman's possessory interest in the South Albany property and surveillance on at least four occasions showing him visiting the South Albany property, the government had met its burden of proving that Coleman had maintained the property for manufacturing or distributing drugs. The court adopted the PSR's calculation of the offense level at 37, and sentenced Coleman to 150 months (below the guideline range).

## II. Discussion

Coleman claims two errors on appeal: that the government suppressed favorable recordings of his co-defendants' statements which could have undermined the leadership enhancement, in violation of *Brady*; and that the district court misapplied the drug premises enhancement on the merits. We apply distinct standards of review to each claim.

Because Coleman did not raise his *Brady* claim before the district court, we review this claim only for plain error. *United States v. Shields*, 789 F.3d 733, 746 (7th Cir. 2015). This means

that, for Coleman to prevail, "the alleged *Brady* violation must be an obvious error that affected [his] substantial rights." *Id*. (quotation omitted).

Coleman preserved his objection to the drug premises enhancement by pressing the argument before the district court. Therefore, we apply our usual standard of review for applications of the sentencing guidelines to this argument, reviewing legal questions *de novo* and findings of fact for clear error. *Montgomery*, 114 F.4th at 850.

### A. *Brady* Challenge

To establish a *Brady* violation, Coleman must meet three elements: "(1) the [Government] suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material to an issue at [sentencing]." *Shields*, 789 F.3d at 746. He claims now that the government suppressed recordings of his co-defendants' post-arrest statements, which he could have used to combat the leadership enhancement. But given the information contained in the FBI 302s, and Coleman's use of that information at sentencing, he cannot demonstrate that the absence of the recordings themselves was material under *Brady*.

Here, the government provided FBI 302s that summarized each of the co-defendants' statements. As Coleman's arguments below demonstrate, the summaries fully communicated that not all the co-defendants painted Coleman as the leader of the DTO, allowing Coleman to counter the FBI's statement to Probation.

We assume without deciding that the recordings themselves, which the government did not volunteer, were "suppressed." Suppressed evidence is material when "there is a

'reasonable probability' that the result would have been different had the suppressed evidence been put before the [finder of fact]." *Goudy v. Cummings*, 922 F.3d 834, 842 (7th Cir. 2019) (quotation omitted). Coleman argues that the recordings would have provided "direct quotes" and "surrounding context" missing in the written FBI 302s. But the 302s already contained the key information Coleman needed: that not all the co-defendants had implicated Coleman as the leader of the DTO, allowing him to undermine the FBI's contrary statement to Probation. Coleman does not claim that the summaries themselves were inaccurate or incomplete.

At most, added context would have helped him further discredit the FBI's statement. But the district court did not rely on that statement in reaching its conclusion that Coleman was a leader. Instead, the court cited the mountain of separate wiretapping evidence showing that various DTO members *did* view Coleman as their leader and deferred to him on crucial operational decisions. While Coleman notes that the district court found the question of Coleman's leadership to be a "very, very, very close case," that was after discounting the statement Coleman sought to impeach—further evidence undermining that statement would not have moved the needle. Because the district court determined that other evidence supported Coleman's leadership status within the organization, and "[p]articularly given the fact that our review is only for plain error, we are confident that the alleged *Brady* violation does not support reversal here." *United States v. Daniel*, 576 F.3d 772, 775 (7th Cir. 2009).

## B. Drug Premises Enhancement

U.S.S.G. § 2D1.1(b)(12) provides for a two-step offense-level enhancement "[i]f the defendant maintained a premises

for the purpose of manufacturing or distributing a controlled substance." We have divided this enhancement into three elements: it applies "if the defendant (1) maintained (2) a premises (3) for the purpose of manufacturing or distributing drugs." *Montgomery*, 114 F.4th at 850 (cleaned up).

Only the first and third elements are at issue here, as Coleman does not dispute that the apartment would constitute "a premises (*i.e.*, a building, room, or enclosure)" for purposes of the enhancement. U.S.S.G. § 2D1.1 cmt. 17. The "maintained" element is met where a defendant "owns or rents … premises, or exercises control over them, and for a sustained period of time, uses those premises to manufacture, store, or sell drugs, or directs others to those premises to obtain drugs." *Ford*, 22 F.4th at 694 (quoting *United States v. Acosta*, 534 F.3d 574, 591 (7th Cir. 2008)). The "purpose" element is met where distribution of a controlled substance is "one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises." *Montgomery*, 114 F.4th at 851 (quoting U.S.S.G. § 2D1.1 cmt. 17).

In concluding that Coleman maintained the South Albany property for the purpose of distributing a controlled substance, the district court explicitly mentioned two factors: Coleman's undisputed possessory interest in the property, and four documented instances of Coleman meeting with DTO managers at the property for the purpose of delivering drugs. Coleman argues on appeal that his possessory interest and infrequent visits to the property, alone, do not meet the "maintained" and "purpose" elements of the enhancement.

### 1. *"Maintained" Element*

In arguing that the district court improperly applied the "maintained" element of the drug premises enhancement, Coleman relies on our opinion in *United States v. Ford*. In *Ford*, the defendant had used a rear bedroom in a house rented by another person to store and sell drugs. 22 F.4th at 690–91. During sentencing, Ford argued that because he lacked a possessory interest in the bedroom and home, he did not "maintain" the premises within the meaning of the enhancement. *Id*. at 694. We held that because Ford was the "main user and occupant" of the rear bedroom, he did "maintain[]" the bedroom as a drug premises but cautioned that such facts "f[ell] close to the limits" of the enhancement. *Id*. at 694–95. Coleman argues that because Watson was the "main user and occupant" of the South Albany apartment, Coleman did not "maintain" the property under *Ford*.

As a preliminary matter, Coleman's reliance on *Ford* does not logically follow: our holding that the drug premises enhancement applied to Ford as a "main user and occupant" does not necessarily mean that the enhancement *only* applies to a "main user and occupant." Rather, we noted in *Ford* that a defendant "maintains" a premises "even if he does not exercise control to the exclusion of all others." *Id*. at 694 (citing *United States v. Sanchez*, 810 F.3d 494, 497 (7th Cir. 2016)). And in *Montgomery*, we noted that "although [the defendant] did not lease the [premises] himself," his ability to "access it whenever he liked" weighed in favor of a finding that he had "maintained" it for purposes of the enhancement. 114 F.4th at 850. Contrary to Coleman's suggestion, *Ford* did not create a new "main user and occupant" requirement; it merely applied our holistic approach by examining "factors …

[including] whether the defendant held a possessory interest in (*e.g.*, owned or rented) the premises and … the extent to which the defendant controlled access to, or activities at, the premises." U.S.S.G. § 2D1.1 cmt. 17.

Applying these factors here, the record supports distinguishing *Ford* and finding that Coleman "maintained" the South Albany property within the meaning of the enhancement. First, it is undisputed that Coleman had a possessory interest in the property as the owner and landlord—a factor relevant to the "maintained" element that was conspicuously missing in *Ford*. *See* 22 F.4th at 694; *Acosta*, 534 F.3d at 591. And the district court found that Coleman was more than a passive landlord: he was a leader of the DTO that directed and controlled the operations at the South Albany property. In other words, Coleman exerted a level of control over the South Albany property that was not present in *Ford*.

To be sure, neither Coleman's possessory interest in the premises nor his direction of the activities there would, alone, suffice to meet the "maintained" element in this case. We do not hold that a landlord, by virtue of his possessory interest alone, "maintains" a premises for drug activities; nor do we collapse the drug premises and leadership enhancements by suggesting that direction alone is sufficient. But the combination of Coleman's possessory interest in and his control and direction of the illicit activities at the South Albany property that satisfies us the "maintained" element is met in this case.

### 2. *"Purpose" Element*

Alternatively, Coleman argues that the district court's finding that he visited the South Albany property only four times over the course of the DTO was not sufficient to

establish the "primary purpose" of the premises under *Montgomery* and *Craft*.

Coleman properly observes that we have limited the scope of the drug premises enhancement—particularly through the "purpose" element—in our recent decisions. In *Montgomery*, the defendant used his sister's storage unit for storing drugs, cash, and paraphernalia. 114 F.4th at 849. But the government presented only three occasions of the defendant accessing the unit in a month-long period, despite facility records showing that the unit was accessed multiple times a day during that same period. *Id*. at 851. Without any explanation as to who else may have accessed the unit—or to what purpose—we held that the three documented uses of the unit, alone, did not establish that the "primary purpose" of the storage unit was drug distribution or storage. *Id*. Similarly, in *Craft*, we held that "several occasions" of the defendant transferring drugs to his partner in his home did not establish that the "primary purpose" of his residence was distributing drugs, where the defendant "most often transferred the drugs … at a local gas station" and "went out of his way to deliver the drugs … *away* from his house." 99 F.4th at 411–12.

But, again, there are key features to this case that distinguish it from *Montgomery* and *Craft*. Most glaring, it is undisputed that the South Albany property was primarily used as a drug premises, and that Coleman was aware of this use. In *Montgomery*, it was crucial that we lacked evidence to compare the defendant's illicit uses against potentially innocent uses of the unit—the record lacked even a denominator. *See* 114 F.4th at 851. But here, there is no mystery about what the South Albany property was used for: it was a nerve center for delivering, cutting, mixing, and packaging the DTO's

product. And unlike in *Craft*, there is no contrary evidence that Coleman "went out of his way" to divert operations from the South Albany property. *Cf.* 99 F.4th at 411–12. Rather, the record supports the district court's conclusion that Coleman facilitated the property's crucial role in the DTO.

Furthermore, Coleman's participation in and *direction* of the illicit activities at the South Albany property well exceeds the conduct in *Montgomery* and *Craft*. *See* U.S.S.G. § 2D1.1 cmt. 17 (instructing courts to consider "the extent to which the defendant controlled access to, *or activities at*, the premises" (emphasis added)). While the district court noted four specific instances of Coleman visiting the property and participating in drug-related activities, that reasoning must be read in concert with the court's broader finding that Coleman directed and controlled the DTO's operations. That is to say, even if the frequency of Coleman's personal visits to the property is in the same ballpark as the frequency of illicit conduct in *Montgomery* and *Craft*, Coleman (as supplier and leader) necessarily had a part in the undisputed illicit conduct that occurred throughout the DTO's operation at the South Albany property. This is not a case, like *Montgomery*, where the three isolated visits to the storage unit were the only evidence of the premises' "purpose." Coleman's continued direction of illicit conduct at the South Albany property, with no countervailing evidence of innocent use, makes the unit's primary purpose plain. *See United States v. Evans*, 826 F.3d 934, 938 (7th Cir. 2016) (upholding the enhancement where defendant lacked possessory interest in apartment but instructed its occupant on storing and distributing drugs there while he was not present).

As with the "maintained" element, it is the combination of factors that meet the "purpose" element. Coleman's knowledge of the continuous and illicit use of the premises, and measure of control and personal participation in this illicit use, together justify application of the drug premises enhancement in this case.

### III. Conclusion

The judgment of the district court is AFFIRMED.